618 S.E.2d 241 (2005)
In the Matter of P.L.P.
No. COA04-1150.
Court of Appeals of North Carolina.
September 6, 2005.
Charlotte W. Nallan and Kavita Uppal, Asheville, for petitioner Buncombe County Department of Social Services.
Judy N. Rudolph, Asheville, for Guardian ad Litem.
M. Victoria Jayne, Hickory, for respondent father.
Charlotte Gail Blake, for respondent mother.
*243 LEVINSON, Judge.
Mother and father appeal the trial court's termination of their parental rights over P.L.P. We affirm.
P.L.P. was born on 25 March 1995. In the months preceding her birth, mother attempted to commit suicide by drug overdose. In response, the Buncombe County Department of Social Services (DSS) offered mother parenting classes and substance abuse treatment.
In the summer and fall of 1999, DSS received reports that P.L.P. was subject to "inconsistent parenting" and domestic abuse, that mother was taking drugs, and that mother had left P.L.P. and her stepsister with mother's brother "for the night and had not returned for a few weeks." Mother's brother was given protective supervision of P.L.P. and her step-sister while mother received treatment for substance abuse and domestic violence. On one occasion, P.L.P. reported feeling sick and urinating blood, and explained that her "mama pulled the seatbelt really hard and hurt my belly."
On 5 November 1999, DSS filed a petition alleging P.L.P. was neglected, on the grounds that she did "not receive proper care, supervision, or discipline from [her] parent, guardian, custodian, or caretaker." The trial court adjudicated P.L.P. neglected, and ordered mother to complete parenting classes, domestic violence programs, and substance abuse treatment. Mother successfully completed the requirements, and by order entered 19 January 2001, the trial court ordered that (1) custody shall remain with mother, and that (2) DSS, the GAL, and their respective attorneys were "released from further responsibility in this matter and this juvenile file is hereby closed."
In November 1999, when DSS filed its first petition, father was in Buncombe County Jail. He was subsequently convicted of attempted first degree murder and sentenced to an active term of fourteen to eighteen years. At the termination hearing, father admitted that, while fighting in "a barroom brawl," he had "stabb[ed] a guy with a small pocketknife[.]"
On 9 May 2002, DSS filed a second petition alleging P.L.P. and her step-sister were neglected juveniles, on the grounds that P.L.P. did "not receive proper care, supervision, or discipline from [her] parent, guardian, custodian, or caretaker" and that she lived "in an environment injurious to [her] welfare." The petition alleged that mother left her children at her brother's house for days at a time, had relapsed into substance abuse, and had been hospitalized for an overdose of drugs. Following a hearing on this petition, the trial court adjudicated P.L.P. to be neglected. The court placed P.L.P.'s custody with Buncombe County DSS, and approved her placement in the home of a caregiver.
Six months later, in December 2002, the trial court conducted a permanency planning and review hearing. The trial court found that the conditions that had required P.L.P.'s removal from her home still existed, and directed that the permanent plan of care for P.L.P. include adoption. At the next permanency planning review several months later, the trial court found that mother's situation remained unchanged. The court directed that the permanent plan for P.L.P. be adoption or guardianship with a relative.
During the summer of 2003, while the child was residing with a guardian, DSS filed another petition alleging P.L.P. was neglected. The allegations in this petition focused on domestic violence between the guardian and his girlfriend, and on the guardian's alcohol abuse. At a hearing the trial court adjudicated P.L.P. neglected, continued her custody with DSS, and changed the permanent plan for P.L.P. to adoption.
On 17 September 2003, DSS filed a motion to terminate respondents' parental rights. At the hearing on this motion, father was present in court, but mother did not appear. In its order, the trial court made findings concerning the history of adjudications, dispositions, review hearings, and permanency planning hearings for the child; the court also found that, notwithstanding his incarceration, father had been present at many of these court proceedings. The court also set out the history of P.L.P.'s placements since P.L.P. first came under the jurisdiction of the court in 1995, and made findings on *244 mother's lack of progress in improving her parenting skills or eliminating her drug dependency. The court also made the following findings concerning father:
. . . .
48. That the Respondent Father has been incarcerated since 1998 and is currently serving a 14 to 18 year sentence for attempted murder. That the Respondent Father made no efforts to provide anything for the minor child at any time, and has not provided any love, nurturance [sic] or support for the minor child. That it is reasonable to assume that the Respondent Father would continue to neglect the minor child if the child was placed in his care, custody, or control as he has shown no interest in the welfare of the minor child.
. . . .
54. That the Buncombe County Department of Social Services testified, and the court will find as facts, that reunification with the Respondent Father cannot take place as Respondent Father will be incarcerated until the minor child reaches majority. That the minor child needs permanency. That the visits with the minor child were blocked but that Respondent Father could have written. Respondent Father did not obtain a substance abuse assessment and treatment, he did not cooperate with the Buncombe County Department of Social Services and he had no involvement with the minor child before his incarceration.
The trial court concluded that both parents had: (1) neglected P.L.P., under G.S. § 7B-1111(a)(1), and (2) willfully left P.L.P. in foster care for more than twelve months without showing that reasonable progress had been made to correct the conditions that led to P.L.P.'s removal, under G.S. § 7B-1111(a)(2). In addition, the court found that mother had failed to pay a reasonable portion of P.L.P.'s costs of care for a continuous six month period, under G.S. § 7B-1111(a)(3), and had willfully abandoned P.L.P. for more than six months immediately preceding the filing of the petition, under G.S. § 7B-1111(a)(7).
Upon these and other findings and conclusions, the trial court concluded that termination of respondents' parental rights was in P.L.P.'s best interests. The court's order of termination was rendered in court on 23 January 2004, and entered on 23 March 2004. From this order respondents timely appealed. On appeal, respondents each contend the termination order should be reversed because the grounds found by the trial court are not supported by sufficient evidence. In addition, mother argues that the court lacked subject matter jurisdiction because she did not receive proper notice of the motion to terminate, and that the order on termination must be reversed because it was not timely entered.
Mother first argues that the court lacked jurisdiction to terminate her parental rights, on the grounds that she did not receive proper notice of DSS's motion to terminate her parental rights. She concedes that service was proper under N.C.G.S. § 1A-1, Rule 5. Mother contends, however, that service could only have been achieved in the instant case by meeting the requirements of N.C.G.S. § 1A-1, Rule 4. We disagree.
N.C.G.S. § 7B-1106.1 (2003) states, in pertinent part, that: "Upon the filing of a motion [to terminate parental rights] pursuant to G.S. § 7B-1102, the movant shall prepare a notice directed to . . . [t]he parents of the juvenile." N.C.G.S. § 7B-1102 (2003), in turn, provides that the service of the motion for termination of parental rights "required by G.S. 7B-1106.1 shall be served in accordance with G.S. 1A-1, Rule 5(b)[.]" However, where "[t]wo years has elapsed since the date of the original action[,]" service "must be in accordance with . . . Rule 4[.]" G.S. § 7B-1102(b)(1)c.
Mother argues that the "original action" was in 1999, when P.L.P. first came under the jurisdiction of the juvenile court. Mother posits that, because 1999 is outside the two-year period next preceding the date of the motion to terminate parental rights, service under Rule 4 was required. She contends that, because the Buncombe County Clerk of Court's office first opened a file concerning *245 this juvenile in 1999, and assigned her case a "99 J" file number, this must be the "date of the original action" as provided in G.S. § 7B-1102(b)(1)c. We disagree.
Under N.C.G.S. § 7B-405 (2003), an "action is commenced by the filing of a petition in the clerk's office[.]" Thus, an action was commenced when the neglect petition was filed in 1999. However, as the trial court correctly observed, the case was later "closed" in December 2000, when P.L.P. was returned to mother's care and custody. Indeed, the trial court ceased exercising jurisdiction over the juvenile at that time. See N.C.G.S. § 7B-201 (2003) ("When the court obtains jurisdiction over a juvenile, jurisdiction shall continue until terminated by order of the court[.]"); In re Dexter, 147 N.C.App. 110, 553 S.E.2d 922 (2001) (court's jurisdiction over the minor child terminated on a date certain as provided in the court order).
In the instant case, after the first case was closed in 2000, another action was not commenced until 9 May 2002, when DSS filed a petition alleging neglect. We conclude that, because jurisdiction had been terminated by the trial court's order to "close" the case, that 9 May 2002 is the date of the "original action" in the case. Because this date is within two years of the motion for termination of parental rights, service under Rule 5 was adequate. This assignment of error is overruled.
Mother next argues that the order on termination must be reversed because it was entered more than thirty days after the termination hearing was completed. We disagree.
Under N.C.G.S. § 7B-1109(e)(2003), "[t]he adjudicatory order shall be . . . entered no later than 30 days following the completion of the termination of parental rights hearing." There is a similar requirement for the entry of an order concerning the disposition, or best interests determination, of a motion to terminate parental rights. See N.C.G.S. § 7B-1110(a) (2003). It has not been an uncommon practice for our trial courts to delay the entry of orders on termination in violation of these time standards. In such circumstances, our appellate courts have uniformly applied a "prejudicial error" analysis to determine whether the subject order must be reversed. See, e.g., In re L.E.B. & K.T.B., 169 N.C.App. 375, ___, 610 S.E.2d 424, 426 (2005) ("This Court has previously stated that absent a showing of prejudice, the trial court's failure to reduce to writing, sign, and enter a termination order beyond the thirty day time window may be harmless error."). This Court has not held termination orders per se reversible where the time standards are not met.
In the instant case, both stages of the termination hearing, adjudication and disposition, were held on 23 January 2004. The order should have been entered within thirty days thereafter. However, the order was not entered until 23 March 2004. Mother does not argue any prejudice resulted from the late entry of the order, and we discern none. Mother nevertheless urges this Court to adopt a per se reversible error rule and remand for a new hearing. However, we are bound by this Court's decisions, which hold that prejudice is the proper consideration when examining whether the delayed entry of an order constitutes reversible error. In the Matter of Appeal from Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.") (citation omitted).
We note that, in addressing this assignment of error, mother addresses the delayed entry of previous permanency planning orders and custody review orders for this juvenile. However, these orders are not the subject of this appeal and have no bearing on whether the order on termination of parental rights should be reversed. As discussed herein, the relevant statutes for an argument concerning the delayed entry of an order on termination of parental rights are G.S. § 7B-1109(e) and G.S. § 7B-1110(a).
The relevant assignments of error are overruled.
We next address the contention of both mother and father that clear, cogent and *246 convincing evidence does not support the trial court's conclusions of law that grounds existed to terminate their parental rights.
"On appeal, the standard of review from a trial court's decision in a parental termination case is whether there existed clear, cogent, and convincing evidence of the existence of grounds to terminate respondent's parental rights." In re Oghenekevebe, 123 N.C.App. 434, 439, 473 S.E.2d 393, 398 (1996). The trial court's findings in this regard are binding on appeal "even though there may be evidence to the contrary." In re Williamson, 91 N.C.App. 668, 674, 373 S.E.2d 317, 320 (1988) (citation omitted). Further, where the trial court finds multiple grounds on which to base a termination of parental rights, and "an appellate court determines there is at least one ground to support a conclusion that parental rights should be terminated, it is unnecessary to address the remaining grounds." In re Clark, 159 N.C.App. 75, 78, 582 S.E.2d 657 n3, 159 N.C.App. 75, 582 S.E.2d 657, 659 n. 3 (2003) (citing In re Greene, 152 N.C.App. 410, 416, 568 S.E.2d 634, 638 (2002)).
"Once the petitioner has proven th[e] ground [for termination] by this standard, it has met its burden within the statutory scheme[.] . . . [T]he court then moves on to the disposition stage, where the court's decision to terminate parental rights is discretionary." In re Montgomery, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the dispositional stage, "the best interests of the child are considered. There, the court shall issue an order terminating the parental rights unless it further determines that the best interests of the child require otherwise." In re Blackburn, 142 N.C.App. 607, 610, 543 S.E.2d 906, 908 (2001); see also G.S. § 7B-1110(a). The fact that "the parent loves or is concerned about his child will not necessarily prevent the court from making a determination that the child is neglected. . . . `The welfare or best interest of the child is always to be treated as the paramount consideration to which even parental love must yield.'" In re Montgomery, 311 N.C. at 109, 316 S.E.2d at 252 (quoting Wilson v. Wilson, 269 N.C. 676, 678, 153 S.E.2d 349, 351 (1967)).
In the instant case, the trial court terminated mother's parental rights under G.S. §§ 7B-1111(a)(1) (neglect), 7B-1111(a)(2) (failure to make reasonable progress), 7B-1111(a)(3)(willful failure to pay reasonable portion of cost of care), and 7B-1111(a)(7)(abandonment).
Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure provides in part, "[a]ssignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned." N.C.R.App. P. 28(b)(6); see also In re Leftwich, 135 N.C.App. 67, 70, 518 S.E.2d 799, 802 (1999) (where respondents failed to argue or assert authority in support of certain assignments of error on appeal from termination proceeding, those assignments held to be abandoned under Rule 28(b)(6)).
Mother has neither articulated an argument, nor provided citations of authority in support of, her assignment of errors addressed to the trial court's conclusions that she neglected P.L.P. under G.S. § 7B-1111(a)(1), or willfully abandoned P.L.P. under G.S. § 7B-1111(a)(7). Mother's cursory argument concerning neglect and abandonment is predicated upon not receiving proper notice of the motion to terminate parental rights, an argument we rejected in our above discussion. The assignments of error concerning G.S. §§ 7B-1111(a)(1) and 7B-1111(a)(7) are deemed abandoned under Rule 28(b)(6). Because these grounds are therefore conclusively established, we need not address mother's arguments concerning the other grounds for termination found by the trial court. The assignments of error pertinent to this discussion are overruled.
The trial court terminated father's parental rights under G.S. §§ 7B-1111(a)(1) (neglect), and 7B-1111(a)(2) (reasonable progress). We first address the court's conclusion that father neglected P.L.P. Father contends that because the trial court's findings of fact are not supported by clear, cogent and convincing evidence, its conclusion of law that he neglected the child cannot be sustained. We disagree.
*247 According to N.C.G.S. § 7B-1111(a)(1) (2003), a court may terminate one's parental rights where:
The parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101.
"Neglect" is statutorily defined, in pertinent part, as follows:
Neglected juvenile.  A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C.G.S. § 7B-101(15) (2003).
"Incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." In re Yocum, 158 N.C.App. 198, 207-08, 580 S.E.2d 399, 405 (2003). "The key to a valid termination of parental rights on neglect grounds where a prior adjudication of neglect is considered is that the court must make an independent determination of whether neglect authorizing the termination of parental rights existed at the time of the hearing." In re McDonald, 72 N.C.App. 234, 241, 324 S.E.2d 847, 851 (1984). Where "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, the trial court must employ a different kind of analysis to determine whether the evidence supports a finding of neglect[,] . . . because requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible." In re Pierce, 146 N.C.App. 641, 651, 554 S.E.2d 25, 31 (2001). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding." In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984).
In the instant case, the trial court found, inter alia, that father (1) "could have written" but did not do so; (2) "made no efforts to provide anything for the minor child"; (3) "has not provided any love, nurtur[ing] or support for the minor child"; and (4) "would continue to neglect the minor child if the child was placed in his care[.]" These findings are supported by clear, cogent and convincing evidence in the record.
As a preliminary matter, we note that the uncontradicted evidence of record demonstrated that father had been continuously incarcerated since 1998; that father would be incarcerated for approximately ten more years, at which time P.L.P. will have reached the age of majority; that father did not obtain a substance abuse assessment and follow-up treatment; and that the child cannot be placed with father during his incarceration. In addition, although P.L.P. visited father "several" times after his incarceration in 1998, these visits were ceased by the trial court, over father's objection, for reasons adequately explained in finding of fact number 23:
[T]he [paternal grandmother] had taken [the juvenile] to see her father in prison and [P.L.P.] . . . has been waking up screaming with nightmares about the prison bars ever since. That based on this, visits with the Respondent Father were ceased.
We next review additional pertinent evidence in the record to determine whether the trial court's findings are supported by sufficient evidence.
At the termination hearing, father admitted that before his incarceration on the attempted murder offense, he "liv[ed] the life of a criminal." Between 1995, when the child was born, and 1998, when the father was jailed on the attempted murder offense, father was in and out of jail-including one time for 120 days on misdemeanor larceny. Although father testified that he was the caretaker for the child before his incarceration, he also testified that, e.g., "[a]ctually she was living with me at my mother's house[.]" Father further acknowledged that he, at times, "was at a friend's house . . . . [I]f you've ever *248 been around two women eating a bunch of pills and cussing [sic] you 24-7, I had pretty much got run off." The testimony of Ms. Hoffart, who worked for Buncombe County DSS, indicates that father was not significantly involved in the child's life before or after his incarceration in 1998:
A: [The father] was available until 1998, before he was incarcerated. But according to the record, he did not participate in any kind of support.
Q: So he hasn't participated, since 1995, in anything that the Department has a record of, as far as care of this child or concern for her welfare?
A: No.
Q: Has he ever provided birthday cards or letters, or anything, for this child, that you're aware of?
A: Not to my knowledge.
. . . .
Q: Are you aware or have any information that [P.L.P.] has ever had [father] involved in her life in any sort of significant way?
A: The child has reported to me that she had involvement with him very early in her life, but not in many years.
Hoffart continued, when questioned by counsel for DSS:
Q: [F]easibly, he could have written to this child?
A: Yes.
Q: Did he ever once, while he was incarcerated, write to [P.L.P.]?
A: No.
When asked by counsel whether father was "involved in any way, shape or form with [P.L.P.]" during the period of time associated with the May 2002 petition alleging neglect, Hoffart answered "no." She also answered "no" when asked by counsel whether there had been any "contact or involvement by father" in July 2003, when P.L.P. was adjudicated neglected. Hoffart also testified:
Q: How many years would you say that's been that he's had no involvement with [P.L.P.]?
A: I would say approximately five.
. . .
Q: Do you have concerns about this child being in the custody of [father]?
A: Yes.
Q: What are those concerns?
A: My concerns would be that she has not maintained a stable relationship with [father].
. . . .
Q: Since you've been involved in this case since May of last year . . . has the father called you to ask about this child or made any suggestions as to who could care for her?
A: He has not contacted me directly, no.
Father testified that he had written to P.L.P. from jail, but had stopped in 2003. In addition, he stated that he spoke with P.L.P. approximately five times in 2003. According to father, he sent letters to mother "up until the time Social Services took custody" and that "[mother] probably has every one of them." Thereafter, father continued, DSS offered to give address information to him for his letters but did not do so. He did not send any letters to DSS or call DSS on his own even though he had the contact information for Social Services, "because every time I'm in court, they spend most of their time trying to keep me away from [P.L.P.], instead of trying to reunite me with her in any way." A social worker testified that, in cases involving other incarcerated parents, she forwards mail from them to their children. Furthermore, according to the record of DSS, father initiated no independent efforts to send letters to the child, and made no efforts to stay in contact with the assigned DSS worker. In fact, he had "never spoken with," written, or contacted "in any way" social worker Hoffart, who had been assigned to the case since May 2003.
We conclude that the trial court's findings of fact are supported by clear, cogent and convincing evidence, and that these findings, in turn, support its conclusion of law that father neglected the child pursuant to G.S. § 7B-1111(a)(1). Since we have concluded that the trial court did not err by concluding that father neglected P.L.P., we need not address father's further arguments regarding termination pursuant to G.S. § 7B-1111(a)(2)(failure *249 to make reasonable progress).
We cannot disagree with the dissent's observation that the trial court relied, in part, on father's past and current incarceration in passing on this motion to terminate father's parental rights. This, of course, was appropriate and permissible. Father's incarceration, together with the balance of the record evidence and findings by the trial court, amply support this termination by the requisite standards. We respectfully disagree with the dissent's observation that father has "consistently and continually done all he can do to maintain ongoing contact with P.L.P." and therefore communicate expressions of care and concern to her. Indeed, father's own testimony-and the trial court's findings-reveal his lackluster efforts to do so. At best, the evidence would only support an inference that father sent letters until the last time P.L.P. was removed from mother's care. Moreover, father's testimony on this issue was contradicted to some degree by the testimony of DSS employees, and "it is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony." In re Gleisner, 141 N.C.App. 475, 480, 539 S.E.2d 362, 365 (2000) (citation omitted). Significantly, after evaluating the witnesses' testimony, the trial court did not find that, e.g., father wrote letters to the child before 2003; nor does father argue on appeal that the court was compelled to do so.
Assignments of error pertinent to this discussion are overruled. In addition, we conclude the remaining arguments by respondents are without merit.
According to social worker Hoffart, P.L.P. "could possibly for the first time in her life have some permanence." This, after at least eight (8) placements since coming into the custody of DSS. Affirmed.
Chief Judge MARTIN concurs.
Judge TYSON concurs in part and dissents in part.
TYSON, Judge concurring in part, dissenting in part.
I concur to affirm the trial court's order terminating mother's parental rights. I respectfully dissent from the majority's opinion affirming the trial court's order terminating father's parental rights.

I. Notice
N.C. Gen.Stat. § 7B-1102 (2003) provides in part:
(a) When the district court is exercising jurisdiction over a juvenile and the juvenile's parents in an abuse, neglect, or dependency proceeding, a person or agency specified in G.S. 7B-1103(a) may file in that proceeding a motion for termination of the parent's rights in relation to the juvenile.
(b) A motion pursuant to subsection (a) of this section and the notice requirement by G.S. 7B-1106.1 shall be served in accordance with G.S. 1A-1, Rule 5(b), except:
(1) Service must be in accordance with G.S. 1A-1, Rule 4, if one of the following applies:
. . . .
c. Two years has elapsed since the date of the original action.
N.C. Gen.Stat. § 7B-1106.1 (2003) states in part:
(a) Upon the filing of a motion pursuant to G.S. 7B-1102, the movant shall prepare a notice directed to each of the following persons or agency, not otherwise a movant:
(1) The parents of the juvenile.
N.C. Gen.Stat. § 1A-1, Rule 5(b) (2003) provides:
Service  How made.  A pleading setting forth a counterclaim or cross claim shall be filed with the court and a copy thereof shall be served on the party against whom it is asserted or on the party's attorney of record. With respect to all pleadings subsequent to the original complaint and other papers required or permitted to be served, service with due return may be made in the manner provided for service and return of process in Rule 4 and may be made upon either the party or, unless service upon the party personally is ordered by *250 the court, upon the party's attorney of record. With respect to such other pleadings and papers, service upon the attorney or upon a party may also be made by delivering a copy to the party or by mailing it to the party at the party's last known address or, if no address is known, by filing it with the clerk of court. Delivery of a copy within this rule means handing it to the attorney or to the party, leaving it at the attorney's office with a partner or employee, or by sending it to the attorney's office by a confirmed telefacsimile transmittal for receipt by 5:00 P.M. Eastern Time on a regular business day, as evidenced by a telefacsimile receipt confirmation. If receipt of delivery by telefacsimile is after 5:00 P.M., service will be deemed to have been completed on the next business day. Service by mail shall be complete upon deposit of the pleading or paper enclosed in a post-paid, properly addressed wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service.
Mother asserts the "original action," as stated in N.C. Gen.Stat. § 7B-1102(b)(1)(c), began in November 1999. However, as the trial court noted during the termination hearing, that file and matter was "closed" in December 2000 and P.L.P. was returned to mother's care and custody. DSS filed a motion alleging P.L.P. to be neglected on 9 May 2002. The matter before us began in May 2002 and is a separate and distinct action from the closed action which occurred during the Summer and Fall of 1999.
DSS properly served notice of its motion to terminate respondents' parental rights upon respondents' counsel on 17 September 2003, within two years of the initial action in May 2002. Respondents received proper service and notice of DSS's motion.

II. Findings of Fact and Conclusions of Law
Respondents assert competent evidence did not exist to support the trial court's conclusions of law and subsequent order terminating their parental rights. I concur to affirm regarding mother, but vote to reverse the trial court's order regarding father's appeal.

A. Standard of Review
"On appeal, `our standard of review for the termination of parental rights is whether the court's `findings of fact are based upon clear, cogent and convincing evidence' and whether the `findings support the conclusions of law.'" In re Baker, 158 N.C.App. 491, 493, 581 S.E.2d 144, 146 (2003) (quoting In re Pope, 144 N.C.App. 32, 40, 547 S.E.2d 153, 158 (2001), aff'd, 354 N.C. 359, 554 S.E.2d 644 (2001)).
There is a two-step process in a termination of parental rights proceeding. In the adjudicatory stage, the trial court must find that at least one ground for the termination of parental rights listed in N.C. Gen.Stat. § 7A-289.32 (now codified as section 7B-1111) exists. In this stage, the court's decision must be supported by clear, cogent and convincing evidence with the burden of proof on the petitioner . . . . Once one or more of the grounds for termination are established, the trial court must proceed to the dispositional stage where the best interests of the child are considered. There, the court shall issue an order terminating the parental rights unless it further determines that the best interests of the child require otherwise.
In re Blackburn, 142 N.C.App. 607, 610, 543 S.E.2d 906, 908 (2001) (internal quotations and citations omitted).

B. Analysis

1. Father
The trial court terminated father's parental rights under N.C. Gen.Stat. §§ 7B-1111(a)(1)-(2) (2003), which provide:
(a) The court may terminate the parental rights upon a finding of one or more of the following:
(1) The parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101.

*251 (2) The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. Provided, however, that no parental rights shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their proverty.
(Emphasis supplied).
N.C. Gen.Stat. § 7B-101(15) (2003) defines a neglected juvenile as a:
juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare. . . .
"Neglect may be manifested in ways less tangible than failure to provide physical necessities [,] . . . the trial judge may [also] consider . . . a parent's complete failure to provide the personal contact, love, and affection that inheres in the parental relationship." In re Apa, 59 N.C.App. 322, 324, 296 S.E.2d 811, 813 (1982). A showing of personal contact, parental love, and affection negates neglect.
Where a respondent has been and continues to be incarcerated, our courts have prohibited termination of parental rights solely on that factor. Compare with In re Shermer, 156 N.C.App. 281, 290-91, 576 S.E.2d 403, 409-10 (2003) (willfulness not shown under N.C. Gen.Stat. § 7B-1111(a)(2) where the respondent was incarcerated but wrote letters and informed DSS that he did not want his parental rights terminated); In re Clark, 151 N.C.App. 286, 565 S.E.2d 245 (termination of parental rights reversed where the father was incarcerated and evidence was insufficient to find that he was unable to care for his child), disc. rev. denied, 356 N.C. 302, 570 S.E.2d 501 (2002); In re Yocum, 158 N.C.App. 198, 204, 580 S.E.2d 399, 403 (the respondent was incarcerated but also did nothing to emotionally or financially support and benefit his children), aff'd, 357 N.C. 568, 597 S.E.2d 674 (2003); In re Williams, 149 N.C.App. 951, 563 S.E.2d 202 (2002) (a father's parental rights terminated because he was incarcerated and he failed to show filial affection for his child).
A review of the transcript and record indicates the primary reason for terminating father's parental rights under both statutory grounds results from his incarceration. Father was charged with and convicted of attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury and was sentenced to an active term of imprisonment of fourteen to eighteen years. Neither of these charges involved P.L.P. or her mother. As of the date of the termination hearing, his remaining sentence was approximately ten years. DSS proffered evidence asserting father did not make efforts to see P.L.P. while in prison, did not contact P.L.P., and would be unable to care for P.L.P. while incarcerated.
Father initially enjoyed regular visits with P.L.P. during his incarceration and testified that during these visits P.L.P. "was the happiest child you'd ever see. She never left my lap . . . She was pretty much a daddy's girl." However, DSS intervened and expressly prevented P.L.P. from visiting father due to its "policy" prohibiting children from visiting incarcerated parents. DSS admits never speaking with P.L.P. on the subject of visitation with her father. DSS further sought and obtained court orders banning and preventing father from visiting with P.L.P. Father applied for visitation, but was denied relief in the trial court on 19 January 2000 and 11 August 2003.
The majority's opinion relies on DSS's testimony that father was not "involved in any way, shape, or form with P.L.P." during the period of time associated with the May 2002 petition alleging neglect. Father testified that before DSS took custody of P.L.P. he wrote and mailed letters to her every other week through her mother and talked to P.L.P. on the telephone. He further testified that when DSS took custody of P.L.P., he asked the social worker if he could write to *252 her in the group home, or if he could write to the social worker to give to P.L.P. The social worker told father that she would send him an address where he could write to P.L.P., but he never received an address from her.
The initial social worker ceased oversight of P.L.P. and the current social worker admitted neither seeking or having any communication with father. Father testified, "they stopped me from any contact whatsoever. They didn't want me to write her." Father testified that he keeps pictures of P.L.P. in his possession and "can't even count the number of pictures" he has of her. P.L.P. is father's only child.
Father participated in every aspect of the multiple juvenile proceedings in attempts to maintain his parental rights. The social worker testified that DSS was not aware of anything that would lead it to conclude that father has willfully failed to pay support to the child. The social worker further testified that father was unable to pay support. The social worker admitted DSS had done nothing to help or encourage father and P.L.P. maintain their familial relationship or to reunify. The present social worker admitted having no interaction or communication with father or any knowledge of the type of parent father was before or while in prison. She made no effort to contact father. The social worker admitted DSS failed to offer services to father solely because of his incarceration.
The majority's opinion relies on the social worker's testimony that father was not significantly involved in P.L.P.'s life before his incarceration. This is not supported by any evidence presented at the hearing. Father testified that until the time of his incarceration, he cared for P.L.P. himself and "pretty much did everything for the little girl." Father also raised C.R., another child of mother, and assumed the role of father to C.R.
DSS acknowledged throughout the hearing that it was apparent that father loved P.L.P. and failed to present any evidence that it assisted or offered services to father. Father stated,
The thing I'm worried about is that I don't get to see her, I don't get to write her, I don't get to call her . . . All I want is my family to have a chance to be around [P.L.P.], even if you let them see [her] on the weekends and maybe let them bring her to see me.
Father requested home studies on family members as a placement for P.L.P. DSS failed to complete these requested home studies.
The record does not include clear, cogent, and convincing evidence to show father: (1) "made no efforts to provide anything for the minor child, and has not provided any love, nurturance or support for the minor child;" (2) "willfully left the minor child in foster care or placement outside the home for more than 12 months" without showing reasonable progress to improve the underlying conditions; (3) cannot be reunified with P.L.P. while incarcerated; (4) could have written P.L.P., but chose not to; and (5) had no involvement with P.L.P. prior to his incarceration. See In re Baker, 158 N.C.App. at 493, 581 S.E.2d at 146. The trial court erred in finding grounds to terminate father's parental rights under N.C. Gen.Stat. § 7B-1111.
Further, the trial court's findings do not support its conclusions of law that father: (1) "neglected the minor child;" and (2) willfully left P.L.P. in "foster care or placement outside the home for more than 12 months without showing reasonable progress" to improve the underlying conditions. The basis for the trial court's findings and ruling stems entirely from DSS's prevention of contact or visitation between father and P.L.P. Although father is incarcerated and may remain so for approximately seven more years, that fact alone cannot support a conclusion to terminate his parental rights. Many parents are voluntarily and physically absent from their children for extended periods of time due to military deployment, hospitalization, or employment. Such physical absence cannot be a basis to terminate their parental rights where these parents seek to maintain contact within the physical limitations of their absence.
Substantial evidence shows father has consistently and continually done all he can do to maintain ongoing contact with P.L.P. and to preserve his parental rights. Such is particularly the case when DSS did absolutely *253 nothing to encourage or facilitate father and P.L.P. to maintain a familial relationship or reunify as required by the statute and actively and expressly prevented contact or visitation between P.L.P. and her father due to DSS's no visitation "policy" regarding children of incarcerated parents.
DSS cannot base this petition to terminate father's parental rights on grounds of failure to make progress, visit, and maintain a relationship with P.L.P. when it failed to provide him with the means to communicate or visit with her and affirmatively prohibited such visits and opportunities for father to maintain his relationship with her. The sole reason for the lack of visits between father and P.L.P. was due to DSS's "policy" preventing children from contact or visiting with incarcerated parents.
Neither father nor P.L.P. should suffer the consequences of a termination of his parental rights and P.L.P.'s rights as a child of her father. "Terminating the father's parental rights carries with it the ancillary action of terminating his responsibility to provide and support his child. In short, this child's right to seek support from [her] father is also terminated." In re Hunt, 127 N.C.App. 370, 374, 489 S.E.2d 428, 430 (1997) (Wynn, J. dissenting).
Retaining non-secure custody of P.L.P. or her placement with her relatives, rather than terminating father's parental rights and P.L.P.'s right to receive support, love, and nurture from her father, serves her best interests. See In re Nolen, 117 N.C.App. 693, 700, 453 S.E.2d 220, 225 (1995) (citation omitted) ("If the best interests of the children require that the parent's rights not be terminated, the court must dismiss the petition.")
The trial court erred in finding grounds to terminate father's parental rights under N.C. Gen.Stat. § 7B-1111. Where no grounds are proven by the required clear, cogent, and convincing evidence standard of proof to terminate parental rights, "the dispositional stage where the best interests of the child are considered" is not addressed. In re Blackburn, 142 N.C.App. at 610, 543 S.E.2d at 908. The trial court's order terminating father's parental rights should be reversed.

III. Conclusion
Respondents received proper notice of DSS's motion to terminate their parental rights. Clear, cogent, and convincing evidence supports the trial court's findings of fact and conclusions of law to terminate mother's parental rights. I concur with that portion of the majority's opinion.
The findings of fact and conclusions of law are not supported by clear, cogent, and convincing or any other evidence. The trial court erred in terminating father's parental rights. I respectfully dissent.