HUNTER, JR. Robert N., Judge.
Respondent-Father appeals from an order terminating his parental rights to T.L.M. ("Tommy") and Z.A.M. ("Zara").[1] Respondent-Father argues the trial court committed the following errors: (1) concluding Respondent-Father willfully failed to make progress under N.C. Gen. Stat. § 7B-1111(a)(2) ; (2) concluding Respondent-Father neglected the children under N.C. Gen. Stat. § 7B-1111(a)(1) ; and (3) failing to make findings to support its disposition. For the following reasons, we affirm in part and remand in part.
I. Factual and Procedural History
On 17 February 2014, the Onslow County Department of Social Services ("DSS") filed a petition alleging Tommy and Zara to be neglected juveniles.[2] DSS alleged the juveniles lacked appropriate care, supervision, and lived in an environment injurious to the juveniles' welfare. The petition alleged the following. The juveniles' parents are currently in the Onslow County jail following their arrest on 19 January 2014 for charges involving felony possession of controlled substances and drug paraphernalia, larceny, and misdemeanor child abuse. On that day, Tommy and Zara were residing in their parents' home. The home was filthy and cluttered "with numerous safety hazards" within the juveniles' reach. The home also contained drug paraphernalia, and it appeared "various other adults" resided in the home.
Respondent-Father admitted to selling methamphetamines, but not in the juveniles' presence. Respondent-Father also admitted to smoking marijuana in the bedroom when the juveniles were home. Respondent-Father stated the juveniles' mother was a sober caretaker at all times. However, the juveniles' mother admitted to using methamphetamines in the past, and admitted to smoking marijuana and taking Adderal to motivate herself to clean the home. She further admitted whenever she did smoke marijuana, there would not be a sober caretaker to provide for the juveniles. The petition also alleges "[t]he juveniles were placed out of the home by [their biological mother] and [Respondent-Father] on or about January 19, 2014 and are currently being cared for by [their paternal grandmother]."
On 22 May 2014, the trial court conducted a hearing on the petition. The trial court awarded DSS legal custody of Tommy and Zara, and ordered they remain with their paternal grandmother. The trial court ordered Respondent-Father to: (1) participate in two hours of supervised visitation per month; (2) comply with all orders of DSS and the court; (3) not expose the juveniles to any illegal drug activities or acts of domestic violence; (4) obtain and maintain stable housing and employment; (5) submit to random drug screenings within four hours of a request by DSS; (6) obtain a substance abuse assessment and follow all recommendations; and (7) regularly attend appropriate parenting classes and Narcotics or Alcoholics Anonymous meetings.
In an order filed 31 October 2014, the trial court found the juveniles' paternal grandmother left them alone and unsupervised for up to four hours on 6 October 2014. The trial court also found the juveniles' paternal grandmother allowed Respondent-Father to have contact with them in violation of the trial court's order. The trial court ordered the juveniles be placed in foster care. The trial court also ordered a home study of the juveniles' paternal grandfather in Nebraska.[3]
On 5 December 2014, the trial court conducted a permanency planning hearing. The trial court entered its order resulting from this hearing on 12 March 2015. The trial court found Respondent-Father failed to have independent housing and complete a substance abuse assessment. The trial court also found DSS requested Respondent-Father to be available for drug screens on 26 September 2014 and 1 October 2014, and Respondent-Father did not comply either time. The trial court ordered the cessation of reunification efforts with Respondent-Father, and adopted a permanency plan of custody with a court approved caretaker.
At a hearing on 15 September 2015, the trial court changed the permanent plan to adoption with a secondary plan of guardianship. Here, the trial court found Respondent-Father was "not actively participating on or cooperating with the plan, the [DSS], and the guardian ad litem" for Tommy and Zara, and was not "acting in a manner consistent with the health and safety of the juveniles." On 25 May 2016, DSS filed a petition to terminate Respondent-Father's parental rights pursuant to N.C. Gen. Stat. §§ 7B-1111(a)(1) and 7B-1111(a)(2) (2016).[4] On 17 and 18 October 2016, the trial court held a termination of parental rights hearing.
DSS first called Monique Moore. She served as the supervisor for the juveniles' case since October 2014. Respondent-Father admitted to Moore he sold methamphetamines and smoked marijuana in his bedroom around Tommy and Zara. DSS ceased reunification efforts with Respondent-Father on 5 December 2014 because he failed to submit to the drug screens DSS requested. Respondent-Father also failed to complete a substance abuse assessment and to obtain stable housing and employment. Additionally, Respondent-Father obtained new drug-related criminal charges and was currently incarcerated due to those charges. Respondent-Father's visitations with Tommy and Zara were inconsistent, and his last visitation with them was August 2015.
Respondent-Father took the stand. No one informed him on how to contact or keep in touch with Tommy and Zara while he was incarcerated. Respondent-Father would have sent letters to Tommy and Zara from prison if he was given the opportunity. Respondent-Father also submitted to "at least" four drug screens. Prior to Respondent-Father's incarceration in November 2015, Respondent-Father installed and repaired roofs for four months. Tommy and Zara lived with foster parents during this time. DSS never informed Respondent-Father he should provide some money to his children. Respondent-Father admitted "I didn't make as many [visitations] as I should have."
Respondent-Father stated he has a drug addiction problem. He inquired about a treatment program in Black Mountain, but the District Attorney's office would have to agree to the program. Tommy and Zara are Respondent-Father's motivation to seek treatment for his addiction. He was active in the juveniles' lives prior to his arrest in January 2014. Respondent-Father was incarcerated eleven months prior to this hearing and had no contact with DSS during that time.
Following Respondent-Father's testimony and closing arguments, the trial court found grounds to terminate Respondent-Father's parental rights. The trial court noted the court ceased reunification efforts with Respondent-Father on 15 July 2015. Additionally, the trial court found "in the Petition that 7B-1111(a)(1) and 7B-1111(a)(2) have been met by clear, cogent and convincing evidence."
DSS again called Moore to testify at the dispositional phase. Tommy is four and doing well. He is up to date on all his immunizations and physicals. He has a significant speech delay "for his age," and attends play therapy and a pre-K program. Tommy and Zara are together in their foster placement, and are doing "absolutely amazing." Zara is three and also has a "pretty significant" speech delay "for her age." Zara attends day care and is up to date on her immunizations, physicals and dental check-ups. The juveniles have been with the same foster parents for two years. The foster parents are "ready, willing, and able to adopt" both Tommy and Zara. The foster parents love the juveniles "as their biological children" and "will do anything for them." The children have a bond with their foster parents and call them "Mommy and Daddy." Neither child demonstrates a bond with Respondent-Father. Neither child has seen Respondent-Father in over a year.
DSS sent out an Interstate Compact on the Placement of Children ("ICPC") on the juveniles' paternal grandfather in Nebraska. DSS stated the ICPC was denied because the paternal grandfather was on "Nebraska's Central Registry."[5] Additionally, the paternal grandfather communicated to DSS "he didn't want to be a placement option because of medical reasons."
Very recently the juveniles' paternal great uncle contacted Moore. He is the brother of the juveniles' paternal grandmother. He spoke with Moore over the telephone for approximately forty to forty-five minutes. Moore testified:
[The great uncle] stated that he called me uhm, to inquire about how to get [Zara] and what I explained to [him] was that it wasn't quite that simple. What he explained to me was he had been contacted by ... his sister. Uhm, and he was told that all he had to do was to come down here, sign the children out of foster care, uhm, and take the children back with him and them give them to her.... But I explained to [the great uncle] at that time was that we are at pretty much the ninth hour at this time. I explained to him that his name has never ever come forward within the last two years from [Respondent-Father] or [Respondent-Father's mother]. That the children have been in placement for over two years with uhm, at two years with their current placement and so the agency felt as though that would be the, in the best interest of the children.
Moore felt concerned because the great uncle stated he was trying to complete his family even though he "does not know anything about the children at all."
Respondent-Father took the stand again. He believed it would be in the juveniles' best interest for them to live with family instead of foster care. Respondent-Father construed his uncle as strict, and he preferred his children to live with his uncle. Respondent-Father acknowledged his uncle has never met Tommy and Zara. Additionally, Respondent-Father believed his uncle had a close relationship with the juveniles' grandmother.
The juveniles' great uncle testified next. He doesn't often communicate with his sister, who is the juveniles' paternal grandmother, but "it doesn't have anything to do with the fact that we don't care for each other." The great uncle is a retired Marine. He contracted Hepatitis C from a blood transfusion while in the military. He is otherwise in good health and has no physical limitations affecting his ability to parent. He was fifty-nine years old at the time of the hearing. He and his wife are unable to have children, and over the past few months they "started seriously talking about adoption." The juvenile's great uncle then learned "there [was] the opportunity possibly to adopt our own family members and to me that takes a priority."
Following closing arguments, the trial court stated:
The court understands ... [the juveniles' great uncle] and his wife who have obviously come here all the way uhm, from Arizona, they want to be placement for these children. They want to be considered to be guardians. They want to be considered to be, to provide custody, and the Court understands that that's really not the issue before the Court today.
The trial court then stated, "the Court's issue is[,] is it in the best interest of [Respondent-Father's] children for the Court to uhm, terminate his parental rights." Additionally, the trial court noted:
[Respondent-Father] never mentioned [the juvenile's great uncle's] name to [DSS] and as the Court is aware [DSS] tells parents before children go into foster care "We need any relative that you believe would be interested in helping raise your children." And that is not a question that asked one time, that is asked numerous times. Now I do believe that after reunification was ceased with [Respondent-Father] that [DSS] probably didn't ask him any more about relatives and I believe reunification was ceased about, at least six months ago maybe longer than that.... [A]nd it is interesting to the Court that [Respondent-Father] never mentioned his [uncle's] name.... There is no part of me that doesn't believe [the great uncle] knew what he could do and he could have done it any day for the 365 days from October 30th of 2014 to October 30th of 2015, or after October 30th 2015 to the present except for September of 2016 when he finally made a phone call.
The court then found it "is in the best interest of these children to terminate the parental rights of [Respondent-Father] and that is so ordered. The Court finds that by clear, cogent, and convincing evidence."
On 9 December 2016, Respondent-Father timely filed notice of appeal.
II. Standard of Review
A trial court conducts a termination of parental rights proceeding in two separate stages: adjudication and disposition. In re S.Z.H., --- N.C. App. ----, ----, 785 S.E.2d 341, 345 (2016). During the adjudication stage, the trial court first determines the existence of one or more grounds for termination of parental rights under N.C. Gen. Stat. § 7B-1111(a). Id. at ----, 785 S.E.2d at 345. "This Court reviews a trial court's conclusion that grounds exist to terminate parental rights to determine whether clear, cogent, and convincing evidence exists to support the court's findings of fact, and whether the findings of fact support the court's conclusions of law." Id. at ----, 785 S.E.2d at 345. The trial court's findings of fact are binding on appeal if they are supported by ample, competent evidence. Id. at ----, 785 S.E.2d at 345. This is so even if there exists evidence to the contrary. Id. at ----, 785 S.E.2d at 345. "However, the trial court's conclusions of law are fully reviewable de novo by the appellate court." Id. at ----, 785 S.E.2d at 345.
"[W]here the trial court finds multiple grounds on which to base a termination of parental rights, and 'an appellate court determines there is at least one ground to support a conclusion that parental rights should be terminated, it is unnecessary to address the remaining grounds.' " In re P.L.P. , 173 N.C. App. 1, 8, 618 S.E.2d 241, 246 (2005) (quoting In re Clark , 159 N.C. App. 75, 78 n.3, 582 S.E.2d 657, 659 n.3 (2003) ).
The trial court proceeds to the disposition stage if it determines at least one statutory ground for termination exists. In re S.Z.H. at ----, 785 S.E.2d at 345. There, the court "must determine whether terminating the rights of the parent is in the best interest of the child, in accordance with N.C. Gen. Stat. § 7B-1110(a)." Id. at ----, 785 S.E.2d at 345 (quoting In re A.B., 239 N.C. App. 157, 161, 768 S.E.2d 573, 575 (2015) ).
"The trial court's determination of the child's bests interests is reviewed only for an abuse of discretion." Id. at ----, 785 S.E.2d at 345 (quoting In re A.B. at 161, 768 S.E.2d at 575-76 ).
III. Analysis
The trial court first terminated Respondent-Father's parental rights on the ground of neglect under N.C. Gen. Stat. § 7B-1111(a)(1) (2016). Respondent-Father contends DSS did not present adequate evidence, and the trial court failed to make proper findings, to support the trial court's conclusion Respondent-Father neglected the juveniles. We disagree.
With regard to the question of neglect, the court made the following findings of fact:
1. The Court finds that pursuant to North Carolina General Statutes 7B-1111(a)(1) [Respondent-Father] has caused the juveniles to be neglected as follows:
A. The juveniles were adjudicated neglected on May 22, 2014 where in an Order filed July 28, 2014, the Court found that:
i. [Respondent-Father] was arrested on January 19, 2014 for multiple criminal charges including felony possession of controlled substances, misdemeanor possession of drug paraphernalia and misdemeanor child abuse.
ii. [Respondent-Father] admitted to selling methamphetamines but not in the presence of the juveniles and admitted to smoking marijuana in the bedroom when the juveniles are sometimes in the home.
iii. The juveniles resided in a home with [Respondent-Father], and the home was observed to be filthy and cluttered with numerous safety hazards within reach of the juveniles. Drug paraphernalia was observed in the home and various other adults were observed to be residing in the home as well.
B. [Respondent-Father] was released from the Onslow County Detention Center on or about April 4, 2014 subject to the conditions of the Pretrial Release Program.
C. On or about August 26, 2015, [Respondent-Father] obtained additional criminal charges for felony possession of heroin, felony manufacturing methamphetamines, and misdemeanor driving while impaired.
D. On or about November 10, 2015, [Respondent-Father] obtained additional criminal charges for felony trafficking methamphetamines, felony manufacturing methamphetamines, felony conspiracy to manufacture methamphetamines, felony possession of precursors, misdemeanor possession of drug paraphernalia and misdemeanor maintaining a dwelling for controlled substances.
E. [Respondent-Father] has been incarcerated in the Onslow County Detention Center since November 10, 2015 with no projected release date. His criminal charges from 2015 are presently pending.
F. [Respondent-Father] has not been compliant with previous Juvenile Orders of this Court and did not complete his case plan. He did not obtain a substance abuse assessment or participate in random drug screenings.
G. [Respondent-Father] has failed to provide care, affection, concern, support or attention to the juveniles. He has not contacted [DSS] to inquire about the juveniles' status and welfare or seen either of the juveniles since August of 2015.
H. [Respondent-Father] has not provided any financial support for the juveniles since they were placed in foster care. He has not provided any gifts or cards at holidays or special occasions for either of the juveniles.
I. [Respondent-Father] has shown by his actions and lack of action that he is not willing or able to properly care for the juveniles or provide a safe home for the juveniles.
J. The likelihood of repetition of neglect of these juveniles by [Respondent-Father] is great in that he has failed to take adequate or sufficient steps to address the issues identified at the time of removal of the juveniles from the home.
Respondent-Father challenges portions of findings (F) through (J) as partially unsupported by evidence. Specifically, Respondent-Father takes issue with finding of fact (F). Here, Respondent-Father argues he participated in random drug screens since the evidence shows he tested "negative" for controlled substances during random requests for drug screens on 29 May 2014 and 17 July 2014. As to the finding in (F) stating Respondent-Father has not completed his plan, Respondent-Father notes the record contains evidence tending to show he obtained a job and was saving money for housing and transportation. Respondent-Father contends these acts show he has worked toward completing his plan.
Respondent-Father also takes issue with findings (G), (H) and (I) which state he has failed to provide care, affection, concern or financial support to the juveniles or to show willingness or ability to care for them. Respondent-Father also disagrees with the finding (J) which states he has failed to take adequate or sufficient steps to address the issues resulting in the removal of his children. Here, Respondent-Father contends the record shows only his incarceration has prevented him from parenting his children. Respondent-Father also contends the record fails to show he intentionally withdrew love and affection for the juveniles.
"[I]t is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony." In re Gleisner , 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). The appellate court "cannot reweigh the evidence or credibility as determined by the trial court." In re P.A., 241 N.C. App. 53, 57, 772 S.E.2d 240, 244 (2015). If the findings of fact made by the trial court "are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary." In re Williamson , 91 N.C. App. 668, 674, 373 S.E.2d 317, 320 (1988). Unchallenged findings of fact "are deemed to be supported by sufficient evidence and are binding on appeal." In re M.D. , 200 N.C. App. 35, 43, 682 S.E.2d 780, 785 (2009).
"[O]n the question of neglect, the trial judge may consider, in addition [to failure to provide physical necessities,] a parent's complete failure to provide the personal contact, love, and affection that inheres in the parental relationship." In re APA , 59 N.C. App. 322, 324, 296 S.E.2d 811, 813 (1982). Although a parent may be incarcerated and his opportunity to contact the child is limited, he "will not be excused from showing interest in the child's welfare by whatever means available. The sacrifices which parenthood often requires are not forfeited when the parent is in custody." Whittington v. Hendren, 156 N.C. App. 364, 368, 576 S.E.2d 372, 376 (2003).
Here, the court took judicial notice of the court file, including prior orders, which show Respondent-Father did not complete a substance abuse assessment scheduled for 29 July 2014 and did not submit to random drug screens in September and October 2014. Respondent-Father also does not challenge the court's finding he was arrested three separate times: 19 January 2014, 26 August 2015, and 10 November 2015. These three arrests occurred over the course of two years and contained charges of controlled substances violations. Respondent-Father was in and out of jail during that time, and he was continuously incarcerated from 10 November 2015 through the date of the termination hearing.
Respondent-Father's own testimony established he never attempted to support or care for his children, even while he was out of jail and working to earn income. He also testified that he did nothing between October 2014 and November 2015 to address his substance abuse problem. Respondent-Father acknowledged he did not visit the children "as I should have," and he did not contact DSS to inquire about the children after he was incarcerated in November 2015. The social worker testified Respondent-Father "did not have much contact" with his children in the year prior to his incarceration in November 2015. Also, the court report prepared by DSS for the permanency planning hearing in July 2015 showed Respondent-Father visited the children on 22 June 2015, after having last visited with them on 20 December 2014.
We conclude the findings of fact are supported by clear, cogent and convincing evidence. We also conclude the findings support the court's conclusion Respondent-Father neglected the juveniles pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), and Respondent-Father will likely repeat this neglect. Since we conclude the trial court did not err in concluding Respondent-Father neglected the juveniles, we need not address Respondent-Father's further arguments regarding termination pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) (failure to make reasonable progress). In re P.L.P. at 13, 618 S.E.2d at 248-49 (2005). Accordingly, this Court does not reach Respondent-Father's argument the trial court erred in concluding he willfully failed to make reasonable progress in correcting the conditions resulting in the removal of Tommy and Zara from his custody.
Respondent-Father next contends the trial court erred by failing to make findings of fact as to all relevant factors in deciding upon termination of parental rights as its disposition. We agree.
Once the trial court determines one or more grounds exist for terminating a parent's rights, the trial court proceeds to make a discretionary determination whether terminating a parent's rights is in the juvenile's best interest. N.C. Gen. Stat. § 7B-1110(a) (2016). Pursuant to this statute,
[T]he court shall consider the following criteria and make written findings regarding the following that are relevant:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
Id. "[T]he language of this statute requires the trial court to 'consider' all six of the listed factors, and that any failure to do so would constitute an abuse of discretion." In re D.H., 232 N.C. App. 217, 220-21, 753 S.E.2d 732, 735 (2014). The court must only make written findings of fact regarding those factors which are relevant and have an impact upon the court's decision. Id. at 221, 753 S.E.2d at 735. Under our case law, a factor is relevant if there is conflicting evidence concerning the factor such that it is placed in issue. In re H.D. , 239 N.C. App. 318, 327, 768 S.E.2d 860, 866 (2015).
Respondent-Father asserts even though the trial court heard evidence concerning the suitability of Respondent-Father's uncle as a kinship or guardianship placement for Tommy and Zara, which was the secondary permanent plan, it made no findings addressing that issue. We agree with Respondent-Father.
The transcript of the entire termination hearing is 187 pages. The transcript of the disposition portion of the hearing begins on page 65. Pages 98 through 166 consist of the direct, cross and redirect examination of the juveniles' paternal great uncle. This witness testified extensively regarding his willingness and suitability to adopt or care for Tommy and Zara. Nine pages of the great uncle's testimony consists of cross examination by DSS. Here, the agency sought to discredit the juveniles' great uncle by, inter alia, calling attention to his prior lack of diligence in seeking to adopt or establish a bond with the children, the last-minute nature of his request, and the uncle's lack of a bond or relationship with Tommy and Zara.
Guardianship or placement with a relative was the secondary permanent plan, and findings regarding the suitability or feasibility of guardianship or relative placement are relevant under N.C. Gen. Stat. § 7B-1110(a)(3). Additionally, this evidence is relevant because there is conflicting evidence as to this issue such that it is "placed in issue by virtue of the evidence presented before the trial court[.]" Id. at 327, 768 S.E.2d at 866 (quoting In re D.H. at 222 n.3, 753 S.E.2d at 735 n.3 ).
Because this evidence is relevant, and because it is an issue upon which the trial court could make factual findings, we remand the disposition portion of the order for entry of appropriate findings pursuant to N.C. Gen. Stat. § 7B-1110(a). See In re J.L.H., 224 N.C. App. 52, 60, 741 S.E.2d 333, 338 (2012).
IV. Conclusion
The trial court correctly found grounds existed to terminate Respondent-Father's parental rights on the ground Respondent-Father neglected the juveniles and the neglect is likely to be repeated. We therefore affirm the adjudication portion of the trial court's order. However, the trial court failed to make findings on relevant factors included in N.C. Gen. Stat. § 7B-1110(a) when determining whether termination of Respondent-Father's parental rights were in the juveniles' best interests. Accordingly, we remand the disposition portion of the trial court's order for further findings as required under N.C. Gen. Stat. § 7B-1110(a), and authorize the trial court to conduct any additional hearings on this issue as it deems necessary.
AFFIRMED IN PART AND REMANDED IN PART.
Report per Rule 30(e).
Judges BRYANT and MURPHY concur.

We use pseudonyms to protect identities of the juveniles and for ease of reading. See N.C. R. App. P. 3.1(b) (2016).

At this time, Tommy was one year old, and Zara was two months old.

DSS conducted an expedited Interstate Compact on the Placement of Children ("ICPC") home study for the juveniles' paternal grandfather residing in Nebraska. The Nebraska Department of Health and Human Services denied the ICPC because the grandfather was on Nebraska's "Central Registry." If the grandfather was on the "Central Registry," then "there had been some type of ... abuse or neglect towards a child." The grandfather also communicated to DSS he would not be able to care for Tommy and Zara due to health issues.

The juveniles' biological mother executed a Relinquishment of her parental rights pursuant to N.C. Gen. Stat. § 48-3-701 et seq. on 12 July 2016. The time for revocation of that Relinquishment has expired.

The transcript is unclear whether DSS or Nebraska denied the ICPC.