IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-28

No. 186A20

Filed 19 March 2021

IN THE MATTER OF: J.S., B.S., and B.S.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 21 January 2020 by Judge Joseph Moody Buckner in District Court, Orange County. This matter was calendared for argument in the Supreme Court on 11 February 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Stephenson & Fleming, LLP, by Deana K. Fleming, for petitioner-appellee Orange County Department of Social Services.*

*T. Richmond McPherson, III, for appellee Guardian ad Litem.*

*W. Michael Spivey for respondent-appellant father.*

EARLS, Justice.

¶ 1   Respondent-father appeals from the orders terminating his parental rights regarding his children Brandon, Jason, and Belinda.[1] We affirm.

## I.   Background

¶ 2   Orange County Department of Social Services (DSS) first became involved with this family in April 2012, following a report that Jason and the children's

---

[1] Pseudonyms are used for the children and their mother throughout the opinion to protect identities and for ease of reading.

mother, Natalie, tested positive for methadone and opiates at his birth. Natalie admitted to taking prescription pain medication that was not hers prior to coming to the hospital, abusing prescription pain medication between the birth of Brandon and Jason, and receiving methadone treatment. At the time of Jason's birth and initiation of the investigation, respondent was incarcerated following a conviction for felony drug trafficking offenses. He had been sentenced on 22 September 2009 to a term of thirty-five to forty-two months. In May 2012, the investigation was closed with services not recommended.

¶ 3 Upon his release from prison, respondent resumed selling narcotics. In March 2015, he was identified by the Orange County Sheriff's Office as a distributor of heroin, and a controlled purchase of heroin using a confidential informant was executed. In May 2015, he was arrested and charged with possession with intent to manufacture, sell, and/or distribute a schedule I substance and conspiracy to sell and/or deliver a schedule I substance. A convicted heroin supplier provided information to the FBI concerning respondent's involvement in his heroin distribution ring. During this time, respondent maintained a relationship with Natalie, and she became pregnant with Belinda.

¶ 4 DSS received another report following Belinda's birth in July 2017, as both Natalie and Belinda tested positive for benzodiazepines, cocaine, and opiates. The family was found to be in need of services, and the matter was transferred to in-home

services in August 2017. Natalie later disclosed respondent gave her illicit substances, including Xanax and heroin, while she was pregnant with Belinda and during the time in-home services were being provided. Belinda remained in the hospital for approximately three months due to complications from withdrawal. Respondent rarely visited Belinda while she was in the hospital, until he was told it was necessary for him to do so in order for her to be discharged to him. Belinda was discharged to his care in October 2017.

¶ 5        Natalie was the primary caretaker of the children, under the supervision of her mother, until December 2017 when DSS received a report of a domestic violence incident between Natalie and her mother while Belinda was present. During the investigation of the incident, Brandon told DSS of prior domestic violence incidents between Natalie and respondent. The children subsequently lived with various relatives, including respondent and their maternal and paternal grandmothers.

¶ 6        In March 2018, law enforcement executed a search warrant at the house where respondent was residing with Brandon and Jason. Officers seized firearms, drugs, and drug paraphernalia. DSS filed petitions alleging all three children were neglected and obtained nonsecure custody on 7 March 2018. The children were first placed in foster care, but they were soon placed with their maternal uncle and aunt in April 2018, where they remained at the time of the termination hearing.

¶ 7        On 3 April 2018, respondent participated in an initial Child and Family Team

(CFT) meeting. Respondent indicated he was "willing to do whatever" was needed to reunify with his children, though he denied the allegations and the reasons given for the children's removal. A case plan was created, identifying areas of need in parenting, substance abuse/mental health, and family relationships. The case plan recommended that respondent participate in a program to address family relationship needs, Pathways to Change, for which he did complete an assessment. However, he was unable to participate in the recommended programs because he was soon incarcerated. Respondent submitted to a drug test at the CFT meeting, and he tested positive for marijuana, heroin, and opiates.

¶ 8 Natalie attended a supervised visit with the children on 25 April 2018, where the social worker observed she had a black eye. She admitted it was caused by an altercation with respondent and also admitted to prior domestic violence incidents. Natalie obtained a domestic violence protective order on 27 April 2018.

¶ 9 Respondent was arrested on 1 May 2018 on federal charges of conspiracy to distribute heroin and fentanyl; possession with intent to distribute fentanyl; use of a communication facility to facilitate the distribution of a controlled substance; distribution of a controlled substance to a pregnant individual; possession of a firearm in furtherance of a drug trafficking offense; and possession of a firearm by a previously convicted felon. Respondent was held without bond at the Alamance County Jail, and he remained incarcerated in various facilities throughout the

juvenile proceedings. On 30 May 2018, the juvenile petition was amended to include allegations of respondent's arrest, drug use, and drug sales.

¶ 10        On 7 June 2018, the trial court held an adjudication and disposition hearing, at which the parties consented to the entry of an order upon stipulated facts adjudicating the children neglected. Respondent was permitted to have a weekly one-hour phone call with the children or a weekly one-hour supervised visit if he was released from jail. The trial court ordered respondent to provide all required information and signed releases to his social worker; submit to mental health and substance abuse assessments and comply with all recommendations; submit to random drug and alcohol screens; participate in a parenting class; and maintain sufficient legal income and appropriate housing for himself and the children.

¶ 11        At the time of the custody review hearing held on 1 November 2018, respondent was in custody at the Orange County Detention Center. He had pleaded guilty to his federal charges and was awaiting sentencing. Visitation remained unchanged, but the trial court removed the requirements that respondent submit to drug screens and maintain income and housing.

¶ 12        The matter came on for a permanency planning hearing on 21 February 2019. Respondent was incarcerated at the Alamance County Jail, awaiting his federal sentencing date of 11 March 2019. Respondent had met with his social worker while in jail for a CFT meeting and to review his case plan, but the trial court found he was

unable to make progress on his case plan due to his incarceration. The court found that the children's reunification with respondent "would be unsuccessful or inconsistent with [their] health or safety and need for a safe, permanent home within a reasonable time" due to his impending, extended incarceration. The court ordered the permanent plan to be a primary plan of adoption with a concurrent, secondary plan of reunification. Respondent was allowed a weekly phone call of at least ten minutes with the children, with DSS having discretion to end the calls if respondent did not follow visitation rules or if the children's treatment team decided the calls were harmful. Respondent's case plan requirements remained unchanged.

¶ 13        The trial court held a second permanency planning hearing on 1 August 2019. Respondent was incarcerated at Williamsburg Federal Correctional Institute following his 21 May 2019 sentencing hearing, where he was sentenced to 336 months' imprisonment for his federal convictions. Respondent was still allowed phone calls with the children, but the calls had become inconsistent after his sentencing and transfer out of state. Natalie had relinquished her parental rights in the children, and DSS had initiated termination proceedings against respondent. The permanent plan of adoption and reunification remained unchanged. Respondent was required to maintain monthly contact with his social worker and provide information as to what programs related to domestic violence and substance abuse he could participate in while incarcerated.

¶ 14        In its 20 June 2019 motions to terminate respondent's parental rights, DSS alleged two grounds for termination: neglect and willfully leaving the children in a placement outside the home for more than twelve months without a showing of reasonable progress. *See* N.C.G.S. § 7B-1111(a)(1), (2) (2019). Subsequent to the termination hearing held 9 December 2019, the trial court entered orders on 21 January 2020 that adjudicated the existence of both grounds alleged in the motions, concluded it was in the children's best interests to terminate respondent's parental rights, and terminated respondent's parental rights in all three children. Respondent appeals.

## II.    Analysis

¶ 15        On appeal, respondent argues the trial court erroneously adjudicated grounds for termination when it did not make findings showing his lack of progress was willful and unreasonable under the circumstances. Respondent further contends the findings were deficient because they did not establish that he was neglecting his children at the time of the termination hearing or that he would be likely to neglect them in the future.

¶ 16        "Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94, (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and

convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.,* 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f)). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111 (1984) (citing *In re Moore*, 306 N.C. 394, 404 (1982)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)).

¶ 17      According to N.C.G.S. § 7B-1111(a)(1), a trial judge may terminate a parent's parental rights in a child in the event that it finds that the parent has neglected the child in such a way that the child has become a neglected juvenile as that term is defined in N.C.G.S. § 7B-101. A neglected juvenile is "[a]ny juvenile less than 18 years of age . . . whose parent . . . does not provide proper care, supervision, or discipline" or "who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (2019). In some circumstances, the trial court may terminate a parent's rights based on neglect that is currently occurring at the time of the termination hearing. *See, e.g., In re K.C.T.*, 375 N.C. 592, 599-600 (2020) ("[T]his Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment."). However, for other forms of

neglect, the fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.,* 373 N.C. 71, 80 (2019). In this situation, "evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights[,]" but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard,* 311 N.C. 708, 715 (1984). After weighing this evidence, the court may find the neglect ground if it concludes the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.,* 375 N.C. 838, 841 (2020) (citation omitted).

¶ 18        Thus, even in the absence of current neglect, the trial court may adjudicate neglect as a ground for termination based upon its consideration of any evidence of past neglect and its determination that there is a likelihood of future neglect if the child is returned to the parent. *Id.* at 841, n.3.  *See also, In re K.N.,* 373 N.C. 274, 282 (2020) (citing *In re Ballard,* 311 N.C. 708, 715 (1984) ("When determining whether future neglect is likely, the trial court must consider evidence of relevant circumstances or events that existed or occurred either before or after the prior adjudication of neglect.").

¶ 19        In this case, respondent does not dispute that there was a finding of prior

neglect. However, he contends that the trial court's findings failed to show either current neglect or a likelihood of future neglect. He asserts the trial court did not directly address whether he was doing everything he could within the limitations imposed by incarceration to care for his children, and he challenges the court's rationales for its conclusion that future neglect was likely, which were: (1) that he had not completed remedial programs and thus was likely to neglect the children if they were to return to his care; and (2) that he created the circumstances for his incarceration.

¶ 20        Specifically, respondent argues that since he will be incarcerated for the next twenty-eight years, it is neither likely nor probable that the children will be in his care again during their minority, and such "an extremely remote possibility . . . does not support a conclusion that neglect during physical care and custody of the children is likely to recur." He asserts the trial court should have assessed the issue of neglect in light of what respondent was capable of while incarcerated. He also asserts that his inability to complete remedial programs does not indicate his lack of interest in the children but instead shows a lack of access to such programs. He points out that the trial court made no findings that he declined to participate in any available programs. Finally, he argues that the trial court's finding that he was responsible for the circumstances of his incarceration only establishes a conclusion of past neglect, but does not establish a probability of future neglect, as the adjudication of neglect

occurred after his commission of and his incarceration for the criminal acts.

¶ 21     "Our precedents are quite clear—and remain in full force—that '[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision.' " *In re M.A.W.*, 370 N.C. 149, 153 (2017) (quoting *In re P.L.P.*, 173 N.C. App. 1, 10 (2005), *aff'd per curiam*, 360 N.C. 360 (2006)).  How this principle applies in each circumstance is less clear. While "respondent's incarceration, by itself, cannot serve as clear, cogent, and convincing evidence of neglect[,]" it "may be relevant to the determination of whether parental rights should be terminated[.]" *In re K.N.*, 373 N.C. at 282–83. "[T]he extent to which a parent's incarceration or violation of the terms and conditions of probation support a finding of neglect depends upon an analysis of the relevant facts and circumstances, *including the length of the parent's incarceration.*" *Id.* at 283 (emphasis added).

¶ 22     In the absence of evidence or findings that respondent's circumstances might change, at the time of the termination hearing it was reasonable for the trial court to expect that respondent will likely be incarcerated for twenty-eight years, until well past the time his children reach majority. This lengthy incarceration implicates a future likelihood of neglect, as respondent cannot provide "proper care, supervision, or discipline" while he is incarcerated, N.C.G.S. § 7B-101(15), and while not the only factor, is a relevant and necessary consideration in the trial court's finding of neglect. *See, e.g., In re P.L.P.*, 173 N.C. App. at 10–11, 13 (concluding that the father's

incarceration, which would continue until the child reached majority, considered along with other record evidence was sufficient to support a finding that he "would continue to neglect the minor child if the child was placed in his care"). Here, the trial court considered the length of respondent's incarceration and how it implicated a change in circumstances between the original adjudication of neglect and the time of the termination hearing, as respondent had been sentenced and was confined in federal prison instead of pre-trial detainment in local detention facilities.

¶ 23        Most significantly, the trial court made additional, unchallenged findings of fact that demonstrate a future likelihood of neglect in this particular case, even acknowledging, as we must, that constructive and positive parenting can occur, and parent/child bonds can be meaningful, while a parent is incarcerated. Those findings include: (1) respondent's history of incarceration for drug offenses; (2) respondent's lack of care and attention to the children when he was not incarcerated; (3) a history of domestic violence between respondent and the children's mother that was witnessed by the children, and the long-term psychological effects on the children as a result of being exposed to violence; (4) respondent's use of illicit substances while the children were in his care; (5) respondent's lack of progress in his case plan; (6) respondent's inappropriate promises to the children in his phone calls, and the children's behavioral regression subsequent to the calls; and (7) eight months of no phone calls following respondent's sentencing—all of which were incorporated under

the trial court's finding of a likelihood of future neglect. *Cf. In re K.N.*, 373 N.C. at 284 (concluding the trial court made insufficient findings to support termination due to neglect, but acknowledging there was other evidence that could have supported a finding of future neglect, including the respondent's history of drug use, extensive criminal record of drug related offenses, the uncertainty of when he would be released from prison and how that would affect his future ability to care for his child, his lack of progress with his case plan, and an incident of domestic violence). The unchallenged findings in this case and the evidence of record support the trial court's determination that respondent neglected the juveniles and that there is a likelihood of the repetition of neglect, which supports the court's conclusion that respondent's parental rights in the children were subject to termination on the grounds of neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 24 Given that the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, *see In re A.R.A.*, 373 N.C. 190, 194 (2019), we need not review respondent's challenge to grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(2). As respondent has not challenged the court's determination that termination of his parental rights in this case is in the juveniles' best interests, we affirm the trial court's termination order.

AFFIRMED.