An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-654

Filed 15 April 2026

Buncombe County, Nos. 22JT000281-100, 22JT000282-100, 22JT000283-100, 22JT000284-100, 22JT000285-100, 22JT000286-100

IN THE MATTER OF: K.J.W., A.J.W., I.B.W., L.I.W., K.J.W., B.I.W., minor children

Appeal by Respondent-Mother and Respondent-Father from order entered 31 March 2025 and 1 April 2025 by Judge Ward D. Scott in Buncombe County District Court. Heard in the Court of Appeals 11 March 2026.

*Robert W. Ewing, for Respondent-Appellant-Mother.*

*Sean P. Vitrano, for Respondent-Appellant-Father.*

*Suzanne Smith Avett, for Petitioner-Appellee Buncombe County Department of Health and Human Services.*

*Ellis & Winters LLP, by Chelsea A. Pieroni, for the Guardian ad Litem.*

ARROWOOD, Judge.

Respondents appeal from order terminating parental rights finding it in the

best interests of the children Bill, Kimberly, Larry, Andy, Isaac, and Ken[1], due to neglect. Respondents argue that several of the district court's findings of fact were not supported by clear, cogent, and convincing evidence, and that the court erred in concluding that three statutory grounds existed to terminate their parental rights, that they willfully left the juveniles in foster care, and that they lacked the ability or willingness to establish a safe home. For the following reasons, we disagree and affirm the trial court's order.

## I.     Background

Respondents have been involved together for over twenty-five years and have given birth to eleven children in total.[2] Although the matter *sub judice* specifically concerns six of their children, the record reveals extensive involvement by the court and social services throughout their family history.

Father and Mother were 19 and 15 years old respectively when their first child, "A.G." was born on 10 January 2001. On or about 7 July 2004, Respondents lived at a motel in Florida while Mother was pregnant with their second child, K.W. A.G. was adjudicated dependent after Father, in A.G.'s presence, choked Mother, held a knife to her throat, and vaginally penetrated her with the knife's handle. A.G. later took

---

[1] The parties agree to use of these pseudonyms pursuant to Rule 42(b) of the North Carolina Rules of Appellate Procedure. Respondents' parental rights to several other children are not at issue in the matter *sub judice*; for clarity, we refer to those children using initials. *See* N.C. R. App. P. 42(b).

[2] Respondents' children born in order of seniority are: A.G., K.W., I.G. (deceased), A.Y.W., Bill, Kimberly, Larry, Isaac, Andy, Ken, and E.W.

the knife and attempted to repeat Father's actions. When Florida Child Protective Services ("C.P.S.") took A.G. into state custody, the motel room was so dirty as to be hazardous, and when Mother gave an investigator A.G.'s clothes, many were covered in dog feces. A.G. had a black eye and several scratches and bruises. This was not the first domestic violence incident involving Respondents, but Mother did not want to bring charges against Father or separate from him.

K.W. was born 5 January 2005. Mother entered a safety plan with the requirement to refrain from contact with Father. Because she violated this stipulation and lacked either housing or any means of support, C.P.S. successfully petitioned to take K.W. into custody on 28 January 2005. Though ordered to complete case plans to reunite with A.G. and K.W., neither Respondent did so. Respondents' parental rights as to K.W. were terminated 3 May 2006, after Mother indicated to the court that she would not contest termination because K.W. had no relationship with her. Their parental rights as to A.G. were involuntarily terminated 19 October 2006.

Respondents' third child, I.G., was born on 11 July 2006. North Carolina Child Protective Services became involved due to concerns that I.G. had inadequate weight gain, and Respondents did not follow through with services. I.G. was hospitalized and died of either SIDS or failure to thrive on 4 February 2007. DSS Social Worker Geri Weaver reported her belief that I.G.'s death was caused, at least in part, by neglect.

On 25 January 2019, six of Respondents' children were ordered into custody of

Transylvania County Department of Social Services ("DSS"). These children were 10-year-old A.Y.W., 9-year-old Bill, 3-year-old Kimberly, 2-year-old Larry, and twins Isaac and Andy, who were only two months old. After a report of neglect, DSS visited Respondents' trailer and found it without heat or hot water in the winter. It had exposed wiring, no working toilet, dirty diapers and piles of feces on the floor, rotting food, a leaking roof, and a rug over a one-foot hole in the floor. The children were barefoot and extremely dirty. Isaac and Andy were found wearing only diapers, and they had fleas, severe diaper rash, and a spoiled baby bottle. During the inspection, their grandmother threatened the social worker with a hatchet.

The six children were subsequently adjudicated both neglected and dependent and Respondents were charged with misdemeanor child abuse. Initial examinations reported the children had multiple serious health challenges: Bill had intellectual and developmental delays, ADHD, PTSD, asthma, and Blount's disease and was unable to read; Kimberly had developmental delays and made allegations of sexual abuse against Bill and Father; Larry had developmental delays and plagiocephaly [flat head syndrome]; Andy had respiratory distress syndrome; and both twins were fitted for cranial development helmets.

Ken, Respondents' tenth child, was born in April 2020 and remained in their custody. Respondents completed their case plans, and the other six children were returned to their custody on 19 August 2020. However, Asheville police responded to a Walmart that same day after a report of young children left alone in a vehicle with

the windows rolled up and the car alarm sounding. After finding Larry, Kimberly, and four-month-old Ken in the vehicle, DSS was notified and Mother was charged with misdemeanor child abuse.

Over the following months, the children were repeatedly truant from school and Respondents failed to follow up with their medical and educational needs. On 24 March 2021, DSS inspected the trailer and found it structurally unsound, full of holes, and infested with rats, with mold and fungus growing out of the toilet, broken windows, and no running water. Despite four adults living in the home, the children "frequently ha[d] overfilled diapers and d[id] not receive adequate bathing," resulting in diaper rash, yeast infections, and diarrhea.

All seven children were quickly placed in custody again and were adjudicated neglected on 27 October 2021. The well-being of several children had "regressed" while they were back in Respondents' custody. Bill's prescribed medications and therapies were not continued. Kimberly had to be taught how to bathe. Bill, Larry, Andy, and Isaac all exhibited violent behavioral problems, and Larry began exhibiting self-harm. None knew how to brush or floss their teeth and none had received dental care. Bill reported that he needed to pull out his teeth with pliers, saying, "That is what my dad did to his teeth, and showed me how."

Respondents were ordered to complete comprehensive case plans to achieve reunification. Both were required to obtain Comprehensive Clinical Assessments including Mental Health and Substance Abuse Assessments, submit to random drug

screens, complete parenting classes, obtain stable income "sufficient to meet the family's basic needs," obtain an "appropriate and safe residence," pay child support, and "maintain face-to-face contact with the social worker." Due to a conflict, the case was transferred to Buncombe County Department of Health and Human Services ("Buncombe County DHHS" or "DHHS").

In a permanency planning and review hearing held 7 February 2023, the court found that Respondents had not obtained stable housing, refused to submit to follicle drug tests, and were dilatory in communication with their children's service providers. The court ordered psychological evaluations and informed Respondents that the court could cease reunification efforts if non-compliance with the care plan continued. Nevertheless, in the subsequent hearing, the court found that Respondents had not scheduled psychological assessments, and that Mother attended supervised visitation with a bruised face and reported that Father caused it. Accordingly, the court ordered Father to complete a domestic violence assessment and ordered Mother to obtain related services.

Respondents ultimately attended psychological evaluations in June 2023 with Christopher Mulchay, Ph.D. ("Dr. Mulchay"), but neither was straightforward and both either under-reported or denied challenges. Both "indicated that they were able to meet all of their children's needs without difficulty." Father "denied any behavioral or mental health concerns" and "demonstrated a lack of insight into his own shortcomings as a parent," blaming all his family's struggles on DSS. Mother also

lacked "insight into the severity of the present/past circumstances," describing their home as "a little messy." Both lied about their previous criminal histories. Dr. Mulchay found both failed to understand "the severity of the children's needs and the amount of time and dedication that it would take to meet those needs." In the next permanency planning and review hearing, the court ordered both parents to attend individual therapy and "demonstrate the ability to have insight into the complex nature of the children's social, behavioral, and emotional needs."

The court changed the primary permanency plan from reunification to adoption on 22 December 2023. In doing so, the court found that neither Respondent engaged with the children's providers or attended visits consistently, that Mother refused DHHS's offers to relocate her to a safe housing program, and that Father had declined to participate in programs recommended after his domestic violence assessment.

On 24 January 2024, DHHS petitioned the court for termination of Respondents' parental rights. On the same day, Mother gave birth to E.W., her eleventh child. E.W. was taken into custody 7 February 2024 and adjudicated neglected on 22 May 2024.

The trial court held a hearing on the petition beginning 14 January 2025. DHHS introduced into evidence Respondents' psychological evaluations and the Guardian ad Litem's report. The Guardian ad Litem recommended dismissal as to A.Y.W., as adoption was no longer in her best interest at 16 years old. Accordingly,

her status is not at issue in this case. Parental rights as to E.W. are also not at issue.

The Guardian ad Litem updated the court on the children's well-being in DHHS custody, discussing both positive developments and additional challenges. Bill showed progress in his group home but continued to require educational accommodations and individual therapy. Kimberly showed disruptive behavior around visits with Respondents and had been referred for trauma-focused cognitive behavioral therapy. Larry continued to display aggressive behavior and required educational accommodations, but his therapeutic foster home was "the best home he has ever lived in." Andy and Isaac had a successful placement in a foster home together, but had some behavioral and educational issues and attended therapy, while Isaac received diagnoses for autism and ADHD. Ken also had a successful foster placement, with parents who wished to adopt him, as well as an autism diagnosis.

The trial court heard testimony from Mother, DHHS social worker Erin Huskins ("Ms. Huskins"), Dr. Mulchay, Transylvania County social worker Susan Jones, and one of Kimberly's foster parents. Ms. Huskins testified that Mother did not complete the ordered therapy, including domestic violence services, and Mother confirmed that since her children were taken into custody, she only attended two therapy sessions. Mother testified that individual therapy would not be helpful and "would have took up too much time." She was unable to recall diagnoses for Bill, Kimberly, Andy, Isaac, and Ken. Ms. Huskins testified that Father had attended

fewer than half of the batterer's intervention classes and had only received credit for five due to non-payment.

Respondents' employment and housing were also discussed. Outside of "temp" jobs, Father was not employed, and Mother was employed at a gas station and started a second job during the hearing. Respondents were renting a two-bedroom trailer after a long period of homelessness or substandard housing. Ms. Huskins also testified that domestic violence had continued between Respondents, including an incident in April 2023.

On 31 March 2025, the court terminated Respondents' parental rights as to Bill, Kimberly, Larry, Andy, Isaac, and Ken. The court made extensive findings of facts and concluded that there were three statutory grounds for termination: past neglect of the children and high likelihood of repeated future neglect; willfully leaving the children in placement outside the home for more than 12 months without showing reasonable progress in correcting the conditions leading to removal; and the involuntary termination of parental rights to another child and the lack of ability or willingness to establish a safe home, pursuant to N.C.G.S. §§ 7B-111(a)(1), 7B-111(a)(2), and 7B-111(a)(9). Respondents filed notice of appeal.

## II. Discussion

Respondents contend that several findings of fact were not supported by sufficient evidence or were actually conclusions of law, and that the trial court erroneously concluded that the three statutory grounds for termination existed. For

the following reasons, we conclude that there were sufficient grounds to terminate

Respondents' parental rights, and finding no error, we affirm the trial court's order.

A.      <u>Standard of Review</u>

In reviewing a trial court's determination that grounds exist to terminate

parental rights, we ask whether the findings are supported by clear, cogent, and

convincing evidence and whether those findings support the conclusions of law. *In re*

*Montgomery*, 311 N.C. 101, 111 (1984).  When a finding of fact is supported by such

evidence, it is "conclusive even if the record contains evidence that would support a

contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019) (citation omitted).  Factual

findings are binding on appeal and deemed supported by competent evidence if

unchallenged. *In re J.S.*, 374 N.C. 811, 814 (2020).  We review "only those findings

needed to sustain the trial court's adjudication." *Id.* (citation omitted).

Where a trial court finds multiple grounds for termination, and this Court

agrees that at least one ground supports this conclusion, "it is unnecessary to address

the remaining grounds." *In re P.L.P.*, 173 N.C. App. 1, 8 (2005) (citation and

quotation marks omitted).  The trial court's legal conclusion that the findings support

a statutory ground for termination of parental rights is reviewed *de novo*. *In re*

*B.O.A.*, 372 N.C. at 379.

B.      <u>The Court Did Not Err in its Conclusion as to Future Neglect</u>

A trial court may terminate parental rights if the parent has neglected the

child.  N.C.G.S. § 7B-1111(a)(1).  Children are neglected when their parents do not

"provide proper care, supervision, or discipline," have not "provided or arranged for the provision of necessary medical or remedial care," or have brought about a "living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15).

> [When] a child has not been in the custody of the parent for a significant period of time prior to the termination hearing . . . evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights, but the trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect.

*In re M.S.E.*, 378 N.C. 40, 47 (2021) (cleaned up) (citing *In re Ballard*, 311 N.C. 708, 715 (1984)). After weighing this evidence, the court may find the neglect ground if it concludes the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841 (2020).

The court "may take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard, because where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence." *In re. T.N.H.*, 372 N.C. 403, 410 (2019) (citing *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981)). However, it "may not rely solely on prior court orders but must receive some oral testimony at the hearing and make an independent determination regarding the evidence presented." *Id.*

Here, respondents contend that 22 of the court's findings of fact were based

solely on its prior adjudication orders, rather than its independent determinations based on evidence presented at the termination hearing. Respondents are correct that the court took judicial notice of the children's files, including "the entire adjudication judgment[,]" and incorporated by reference findings of fact from the judgments and "the decretal portions of the subsequent orders."

The findings of fact Respondents challenge on this basis fall into two categories. The first group concerns the living conditions and health concerns existing when the children were first taken into custody on 25 January 2019, leading to the adjudication of neglect filed 4 June 2019. The second group concerns the evidence supporting the second juvenile petition on 25 March 2021, leading to the second adjudication of neglect entered 27 October 2021.

The first adjudication was based upon "clear and convincing evidence." This adjudication order was "incorporated by reference as if more fully set forth" as findings of fact "based upon clear, cogent, and convincing evidence" in the disposition filed 22 July 2022. The trial court's actions incorporating the previous order were proper, as all the facts found in the adjudication order were found by clear, cogent, and convincing evidence.

The second group of factual findings were made "by clear, cogent, and convincing evidence" and incorporated into the second adjudication order. Crucially, Respondents stipulated to these findings of fact and expressly acknowledged this by signing the consent adjudication order along with their attorneys. Respondents never

appealed from these adjudication orders and are therefore bound by the doctrine of collateral estoppel from re-litigating these findings. *In re T.N.H.*, 372 N.C. at 409 (citing *In re Ordinance of Annexation No. 1977-4*, 296 N.C. 1, 14 (1979)) ("[S]tipulations constitute judicial admissions binding on the parties and dispense with the necessity of proving the stipulated fact. Such stipulations continue in force for the duration of the controversy and preclude the later assertion of a position inconsistent therewith."). Accordingly, Respondents' challenged factual findings as to past conditions met the heightened evidentiary standard, and for its findings as to conditions at the time of the hearing, the court relied properly on testimonial evidence and the parties' admitted exhibits.

Respondents also challenge five findings for having been "improperly characterized as findings" despite being conclusions of law. But "[t]he labels 'findings of fact' and 'conclusions of law' employed by the trial court in a written order do not determine the nature of our review." *Westmoreland v. High Point Healthcare, Inc.*, 218 N.C. App. 76, 79 (2012). The court's "mislabeling of its findings and conclusions will not be fatal to its order . . . . As long as each link in the chain of reasoning appears in the order, mislabeling is merely an inconvenience to the court." *State ex rel. Utils. Comm'n v. Eddleman*, 320 N.C. 344, 352 (1987) (quotes omitted) (cleaned up). Here, this is an inconvenience *de minimus*, as all five statements are clearly supported by relevant factual findings.

Even if we assume *arguendo* the invalidity of the challenged findings, the court

heard ample evidence at the termination hearing as to "changed conditions" and the "probability of a repetition of neglect," as required when juveniles have been in custody for an extended period, and unchallenged findings resulting therefrom sufficed for the conclusion that future neglect was likely. "In predicting the probability of a repetition of neglect, the court must assess whether there is a substantial risk of future child neglect based on the historical facts of the case." *In re M.C.*, 374 N.C. 882, 889 (2020) (cleaned up). "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)).

Respondents do not dispute that, in the four years preceding the termination hearing, they failed to complete their case plans. Nor can they do so, given the voluminous record and testimony detailing their exceedingly indolent conduct and deficient compliance, despite the court's persistent warnings.

Respondents were ordered to "follow and successfully complete all recommendations" following their Comprehensive Clinical Assessments. Mother was repeatedly dishonest in that psychological testing. Nevertheless, Dr. Mulchay made extensive recommendations; as to Mother, he recommended economic support and job coaching, evidence-based trauma therapy, and individual therapy, and as to Father, he recommended individual therapy, parenting coaching, and anger management. Mother attended only two therapy sessions, and Father attended none.

The court also heard extensive testimony concerning domestic violence and

Respondents' refusal to engage in relevant services. The findings are unchallenged as to Respondents' domestic violence history from Florida. The court heard conflicting testimony as to more recent incidents from Ms. Tibstra and Mother, but made factual findings indicating that he found the social worker's account more credible. Father was ordered to enroll in a batterer's intervention program, but he only earned credit for five out of 26 classes. Dr. Mulchay testified about Respondents' inconsistent stories about domestic violence, and the court found that Father "does not recognize or is unwilling to convey himself as a perpetrator of serious domestic violence." Likewise, Mother never participated in the domestic violence services offered and declined DHHS's repeated referrals to transitional housing for women in need.

Ultimately, Dr. Mulchay opined that both Respondents "lacked insight into the severity" of both the children's needs and "the amount of time and dedication it would take to meet those needs," and that neither had the ability to provide for their basic needs. This testimony is supported by the written records of his evaluations. The court made factual findings consistent with his testimony in support of its conclusion as to the likelihood of future neglect.

Accordingly, there was sound evidentiary basis for the court's findings about Respondents' refusals to complete their care plans and failure to understand either the ongoing effect of their past behavior or the children's extensive needs and traumas. Those findings, in themselves, support the legal conclusion that future

neglect was highly likely. *See In re M.C.*, 374 N.C. at 889, *see also In re L.G.G.*, 379 N.C. 258, 269–71 (2021) ("The findings also establish that respondents failed to accept responsibility for their actions and for the trauma the children experienced . . . . Consequently, we conclude the trial court's findings of fact support its conclusion that respondents neglected the children and that there was a high likelihood there would be a repetition of neglect if they were returned to their care.")

Because we agree that at least one statutory ground supported termination, Respondents' further contentions cannot succeed. Moreover, the findings of fact discussed above were also directly relevant to the court's other contested conclusions. Because of Respondents' woeful unwillingness to comply with multiple aspects of their case plans, the trial court did not err in finding that they failed to make reasonable progress to correct the conditions leading to these children's removal. *See* N.C.G.S. § 7B-1111(a)(2), *see also In re B.O.A.*, 372 N.C. at 383–84 (2021) (holding that "parental compliance with a judicially adopted case plan is relevant" to this analysis). As to the third statutory ground, it is undisputed that Respondents' parental rights were previously terminated involuntarily, and the findings as to the high likelihood of future neglect were sufficient to support its conclusion. *See In re L.A.B.*, 178 N.C. App. 295, 299 (2006) (statute requires finding of two separate elements). Respondents were indeed unable to establish a safe home, which is statutorily defined as a "home in which the juvenile is not at substantial risk of physical or emotional abuse or neglect." *See* N.C.G.S. §§ 7B 101(19), 7B-1111(a)(9).

Accordingly, in light of the overwhelming evidence that Respondents were likely to subject any children returned to their custody to further neglect, the three contested legal conclusions were entirely proper.

## III. Conclusion

For the above reasons, we affirm the trial court's order terminating Respondents' parental rights as to the minor children K.J.W., A.J.W., I.B.W., L.I.W., K.J.W., B.I.W.

AFFIRMED.

Judges STROUD and WOOD concur.

Report per Rule 30(e).