An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-576

Filed 6 May 2026

Harnett County, Nos. 24JT000044-420, 24JT000045-420

IN THE MATTER OF: G.C., G.C.

Appeal by respondent-mother from order entered 26 February 2025 by Judge Travis N. Wheeler in Harnett County District Court. Heard in the Court of Appeals 21 April 2026.

>   *Peter Wood for appellant-respondent-mother.*
>
>   *Torrie Humphreys for petitioner-appellee Harnett County Department of Social Services.*
>
>   *Michelle F. Lynch for the Guardian Ad Litem.*

ARROWOOD, Judge.

Respondent-mother ("Mother") appeals from order terminating her parental rights to her children, Greg and Gertrude.[1] For the following reasons, we affirm the trial court's order.

---

[1] Pseudonyms are used to protect the identities of the minor children.

## I. Background

Greg was born in January 2017 and adjudicated neglected after a hearing on 14 October 2019. The trial court found that on 17 June 2019, Mother left Greg alone and unsupervised in her car while she went inside an establishment. Greg was alone for at least 17 minutes. He unbuckled his car seat and was found out by the road. Additionally, on 22 July 2019, there was a domestic violence incident between Mother and Greg's father ("Father")[2] while Greg was in the car. Father was driving and Mother began yelling and acting erratically. She kicked the steering wheel and Father pulled over. When law enforcement arrived on the scene, Mother was combative with them. Law enforcement allowed Father to leave with Greg and offered to give Mother a ride home. She declined and then walked into traffic while making statements indicating that she wanted to kill herself. Mother was taken into emergency custody for her own protection and admitted into the hospital.

The trial court also found that Mother had inappropriately slapped Greg on several occasions dating back to 2018. On one specific occasion in the summer of 2019, Mother slapped him hard enough to cause Greg to fall to the ground. Mother would also occasionally kick and hit Father in Greg's presence. The trial court concluded that Greg did not receive proper care, supervision or discipline from a parent and lived in an environment injurious to his welfare. Accordingly, the trial

---

[2] Father is deceased and not a party to this action.

court awarded legal and physical custody of Greg to the Harnett County Department of Social Services ("DSS") and granted Mother supervised visitation. The trial court then conducted a permanency planning review hearing on 10 January 2020, after which it entered an order establishing a primary permanent plan of custody with a relative or other suitable person and a secondary permanent plan of reunification.

Gertrude was born on 26 January 2020 and adjudicated neglected following a hearing on 26 June 2020. The trial court found that when Gertrude was born, she was admitted to the Pediatric Intensive Care Unit ("PICU"). During Gertrude's stay in the PICU, Mother and Father were allowed to stay in a nearby Ronald McDonald House. However, they did not spend sufficient time with Gertrude, once going three days without visiting. Gertrude was going to need special care upon discharge, and Mother and Father did not learn what they needed to do to address those needs. When Mother did visit, she told hospital staff she needed to leave to tend to Greg, despite Greg being in DSS custody at the time. Additionally, Mother and Father left the room at the Ronald McDonald House in a filthy state and police were called to investigate reports of domestic violence between them at least twice.

The trial court concluded that Gertrude did not receive proper care, supervision, or discipline and, if released to a parent, would have lived in an environment injurious to her welfare. Accordingly, the trial court awarded legal and physical custody of Gertrude to DSS. The trial court did not award a minimum period or frequency of visitation with Mother, instead leaving visitation to the discretion of

DSS.

While the children were in DSS custody, Mother had few visits with them. Mother attended visits with Greg on 13 February and 27 February 2020. She missed visits on 23 January and 12 March 2020. After 20 March 2020, face-to-face visits ceased due to the COVID-19 pandemic. Mother requested her first virtual visit with Greg on 5 August 2020 which took place on 20 August 2020. After the visit, Greg had two temper tantrums. Mother requested several other visits in late 2020 to early 2021, which she ultimately did not schedule or attend. Mother had no visits with the children after 2021, which she attributes to DSS declining to exercise its discretion to arrange visits. However, Mother did regularly provide clothes, toys, and school supplies for the children.

The trial court ceased reunification efforts and established adoption as the primary permanent plan in Permanency Planning Review Orders entered 20 August 2021. In the orders, the trial court summarized Mother's progress on her case plan. Mother's case plan included obtaining a mental health or psychological evaluation as well as a substance abuse assessment and following all recommendations for treatment. Mother cooperated with a clinical assessment at Daymark Recovery Services ("Daymark") on 13 February 2020 and was diagnosed with PTSD and Cannabis Use Disorder. She was referred to a therapist, a 16-week parenting group, and a Seeking Safety Group, which focuses on substance abuse and domestic violence. However, Mother did not return to Daymark after her assessment

and was eventually dropped from the group sessions due to her absences.

Mother told her DSS social worker that she did not have mental health issues and only needed parenting classes. However, she also expressed a desire to find another program like Daymark. In January 2021, Mother completed a comprehensive clinical assessment at Freedom House. She was diagnosed with adjustment disorder with depressed mood. The assessment found that Mother did not meet the criteria for substance abuse. Her clinician recommended individual therapy and a psychiatric evaluation for medication management, but Freedom House had not linked Mother with any services due to staffing changes and shortages. Mother refused to acknowledge symptoms of PTSD.

Mother's case plan also included cooperation with drug screens. Mother cooperated with a drug screen at Daymark on 13 February 2020 and tested positive for THC. Her social worker attempted to schedule a drug screen at noon on 22 September 2020, but Mother did not respond until 2:25 p.m. that day, after drug screening had finished for the day. Mother cooperated with a drug screen on 27 October 2020 and tested negative.

Another goal in Mother's case plan was completion of a parenting program. As mentioned above, Mother failed to attend the parenting class at Daymark in February 2020. In May 2020, Mother inquired about taking parenting classes online. On 12 June 2020, Mother reported that she was going to take classes at SAFEchild, including parenting classes. Mother missed several classes and was marked absent

at least twice for sleeping through class. She completed the parenting classes on 23 November 2020.

Mother's case plan also required that she obtain and maintain stable employment and housing. Mother provided DSS with a new address on 27 February 2020 and a copy of a lease on 4 May 2020. Person County DSS completed a home study and discovered that the home did not have a working smoke detector. From 12 August 2020 to November 2020, Mother worked at GKN Automotive. At the time of the 11 June 2021 hearing, Mother was employed at Carolina Meadows and Wisdom Senior Care.

The trial court concluded in its Permanency Planning Review Order that Mother had not made adequate progress on her case plan within a reasonable period of time. While Mother had recently started making some effort, the trial court found that she had made very little progress. Additionally, Mother was frequently uncooperative with the DSS social worker.

On 8 February 2023, Mother gave birth to another child, G.J.[3] Mother left the child unattended in a car while she was gambling on at least two occasions while the child was between one and two weeks old. When the child was four weeks old, Mother left them unattended in a hotel room in Miami, Florida. The child was eventually brought into the custody of the Miami-Dade County DSS.

---

[3] Initials are used to protect the identity of the minor child. Mother's parental rights to G.J. are not a subject of this action.

DSS filed petitions to terminate Mother's parental rights to Greg and Gertrude on 30 May 2024. The trial court conducted hearings on 12 November 2024, 7 January 2025, and 21 January 2025. The trial court received testimony from past and current social workers describing Mother's progress on her case plan and their opinions on her ability to care for the children. Each social worker provided examples of Mother making some progress under the case plan but expressed concern about her lack of consistency and stability. Mother also testified on her own behalf.

Following the hearings, the trial court entered an order terminating Mother's parental rights on the grounds of neglect, willfully leaving the children in foster care, and willfully abandoning the juveniles. The order incorporated the above-mentioned findings from its past orders and additionally found that Mother's neglect continued because she was not cooperating with a plan of reunification and her failure to make substantial progress in her case plan was inconsistent with the health and safety of the children. The order also described instances of Mother's erratic behavior during interactions with DSS in 2021 and noted that Mother has had minimal contact with DSS since 2021. Mother filed notice of appeal to this Court on 28 March 2025.

## II. Discussion

Mother challenges several of the trial court's findings of fact and argues that the trial court erred in finding that there were grounds to terminate her parental rights based on neglect, willfully leaving the children in foster care, and abandoning her children. For the following reasons, we hold that the trial court did not err in

finding that there were grounds to terminate Mother's parental rights based on neglect. Accordingly, we affirm the trial court's order.

## A.    Standard of Review

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' " *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). When a finding of fact is supported by such evidence, it is "conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019) (citation omitted). Additionally, unchallenged findings of fact made by the trial court are binding on appeal. *In re Z.V.A.*, 373 N.C. 207, 211 (2019). We review "only those findings needed to sustain the trial court's adjudication." *In re J.S.*, 374 N.C. 811, 814 (2020) (citation omitted).

Where a trial court finds multiple grounds for termination, and this Court agrees that at least one ground supports this conclusion, "it is unnecessary to address the remaining grounds." *In re P.L.P.*, 173 N.C. App. 1, 8 (2005) (citation and quotation marks omitted). The trial court's legal conclusion that the findings support a statutory ground for termination of parental rights is reviewed de novo. *In re I.M.S.*, 298 N.C. App. 689, 694 (2025).

## B.    Neglect

"A trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101." *In re M.S.E.*, 378 N.C. 40, 47 (2021) (citing N.C.G.S. § 7B-1111(a)(1)). A neglected juvenile is defined, in relevant part, as a juvenile whose parent "[d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15). Termination of parental rights may be "based on neglect that is currently occurring at the time of the termination hearing" or, if the child has not been in the custody of the parent for a significant time prior to the termination hearing, "a likelihood of future neglect by the parent." *In re B.R.L.*, 379 N.C. 15, 21 (2021).

To determine whether future neglect is likely, " 'evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights[.]' " *In re M.S.E.*, 378 N.C. at 48 (quoting *In re Ballard*, 311 N.C. 708, 715 (1984)). However, the trial court must also "consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.G.J.*, 378 N.C. 500, 509 (2021) (quoting *In re R.L.D.*, 375 N.C. 838, 841 (2020)). "It is well established that . . . '[t]he determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*.' " *Id.* (quoting *In re Ballard*, 311 N.C. at 715). "A parent's failure to make progress in

completing a case plan is indicative of a likelihood of future neglect." *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018) (citation omitted).

In *In re Z.G.J.*, our Supreme Court reversed a trial court's adjudication terminating parental rights on the neglect ground where the trial court failed to consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing. 378 N.C. at 509–10. There, the only evidence offered by DSS at the September 2019 adjudication hearing was witness testimony from the social worker who had worked with the family and signed a verification for the neglect petition that was filed in August 2018. *Id.* at 503–509. She testified that she reviewed the contents of the neglect petition, was satisfied that they were true and accurate to the best of her knowledge, and adopted the contents as her testimony at the adjudication hearing. *Id.* at 506–507. She did not testify about any events or circumstances occurring after the filing of the petition. *Id.* at 507. Our Supreme Court held that the trial court erred by relying solely on the thirteen-month-old petition because its "stale information" did not "shed any light on the respondent's fitness to care for [the child] at the time of the termination hearing[.]" *Id.* at 509–510.

Here, the trial court's relevant findings are supported by clear, cogent and convincing evidence and the findings support the termination of Mother's parental rights on the ground of neglect. Relevant to our determination, Mother challenges the following findings of fact by the trial court:

48. Grounds exist pursuant to N.C. Gen. Stat. § 7B-1111 for the termination of parental rights of [Mother] as to the juveniles [Greg] and [Gertrude] in that:
a. Neglect § 7B-1111(a)(l):
. . . .
iv. The mother's neglect continues as she is not cooperating with a plan of reunification. Her failure to make substantial progress is conduct inconsistent with the health and safety of the children.

v. The mother did not visit with the juveniles on a regular or consistent basis. The mother last visited with [Greg] and [Gertrude] in 2021.

vi. The mother has not alleviated the concerns of which the juveniles were removed from her care. The mother gave birth to another juvenile, G.J. on February 8, 2023. The mother left the juvenile unattended in a car while gambling at the sweepstakes on at least two occasions while the juvenile was approximately 1-2 weeks old. The mother left the juvenile unattended in a hotel room in Miami, Florida while the juvenile was approximately four weeks old. The juvenile is in the custody of Miami-Dade County, Florida Department of Social Services.

vii. The mother maintained contact with the social worker since the June 2021 hearing date until December 1, 2021. Her behavior was erratic and shows that she is unstable and unable to provide a safe and adequate home for the juvenile. She has only had minimal contact with DSS since 2021.
. . . .
ix. The mother attended a permanency planning review meeting on December 8, 2021. The mother displayed erratic behavior during the meeting. She cut off a social worker supervisor several times. She was unable to control her emotions or to have a meaningful conversation with the other participants.
. . . .
xi. The mother's non-cooperation and non-compliance with a plan of reunification throughout the duration of the time

the juveniles have been in care evidence a likelihood that the neglect has and will repeat and continue if the juveniles were returned to the care of the mother.

xii. The juveniles remain at risk of substantial harm or substantial risk of harm if the juveniles were returned to the care of the mother.

Each finding is supported by testimony at the termination hearing. Three DSS social workers provided testimony at the termination hearing to provide a comprehensive picture of Mother's progress on her case plan. The first social worker was involved with the family through April 2023 and testified about Mother's progress on her case plan during that time. She testified that DSS had no contact with Mother from January to April 2023 and that outside of 2023, Mother was not able to maintain consistent contact with DSS, despite Mother's case plan requiring monthly or regular contact with the social workers. She also stated that since she has been involved with Mother, her progress on her case plan "has been inconsistent." DSS did not receive consistent pay stubs and Mother moved several times. Further, Mother's lack of progress, particularly with her mental health, was evident in her outbursts with DSS.

As to specific events, the social worker testified that Mother displayed erratic behavior during the 8 December 2021 permanency planning review meeting. She stated that Mother cut off her supervisor several times and was unable to control her emotions. She said "it was very hard for us to have a meaningful conversation with [Mother] at that time." She also described reports of Mother leaving G.J. unattended

that align with the trial court's Finding of Fact 48(a)(vi). Mother testified that the report was incorrect, but the social worker's testimony provides clear evidence to support the trial court's finding.

The second social worker was involved with the family from July 2023 up to the termination hearing. She described how Mother's progress with her case plan improved around June 2024 but stated that there were still concerns with Mother's lack of consistency. For example, Mother began regularly corresponding with DSS over email towards the end of 2023 and has cooperated with random and scheduled drug screens. However, Mother still refused some drug screens and tested positive for cocaine and benzoylecgonine in February 2024. Additionally, there was inconsistency with Mother's employment, where Mother lived, and who lived with her. Mother also had not attended any therapy from 2023 up until the termination hearing, except for a single intake appointment one week before the hearing.

The third social worker was a placement supervisor who had been involved with the family since September 2023. She testified that there were still concerns with domestic violence regarding Mother and that Mother had not attended therapy when urged to do so. When asked for her opinion on Mother's progress on her case plan, she responded:

> She does not understand where the concern comes from.
> She does not -- she does not believe she did anything wrong.
> She does not believe she neglected her children. And so she
> has a hard time understanding why we're continuing to
> want to see her do these things. In her mind, she's

> completed everything, and we continue to explain to her the circumstances surrounding why we're concerned and why -- why we want her to do the things that we're asking her to do. There are periods where she will make some progress, which, as the other workers have testified is easily surrounding court dates. We will typically see an uptick in her involvement. And then if the case is continued, then there's that decrease.

She also stated that she did not believe that Mother had made enough progress on her case plan for her to recommend reunification.

Thus, the testimony from the social workers supports both the trial court's description of specific events, such as the 8 December 2021 phone call and Mother leaving G.J. unattended, as well as the more general findings that Mother has not made sufficient progress in her case plan. Accordingly, these findings of fact are conclusive. Further, these findings of fact support the conclusion of law that there were grounds to terminate Mother's parental rights based on neglect. Over three years into her case plan, Mother repeated her initial mistake of leaving her young child unsupervised, demonstrating a lack of understanding of the harm of her behavior and a likelihood that it will be repeated. Additionally, at the time of the hearing, her social workers still had concerns of domestic violence which played a significant role in the removal of Greg from her custody. Her inconsistency, instability, and general lack of progress on her case plan also support the finding of a likelihood of future neglect if the children were returned to her care.

Mother compares this case to *In re Z.G.J.* and contends that the trial court "did

not properly find a probability of neglect because the findings of fact only concerned the events in the distant past, not recent history." While it is true that the specific events mentioned in the trial court's findings are as distant from the termination hearing as the evidence considered in *In re Z.G.J.*, this case is still distinguishable. In *In re Z.G.J.*, the trial court exclusively considered evidence from the petition to terminate parental rights. Whereas, here, the evidence of relevant distant events was supplemented with testimony of Mother's more recent progress on the case plan and her social workers' current assessment of whether reunification was appropriate. The testimony from the social workers that, despite an uptick in progress, some of the same concerns persisted and Mother had still not demonstrated consistent stability or progress allowed the trial court to determine that, at the time of the termination hearing, there was a likelihood of neglect if the children were returned to Mother. That the trial court was considering Mother's progress at the time of the hearing is demonstrated by the present tense of its findings, for example, Mother "*is* not cooperating with a plan of reunification."

We do not read *In re Z.G.J.* as requiring a trial court to make findings about specific events occurring between the filing of the petition to terminate parental rights and the termination hearing. Rather, it requires that the trial court's findings and conclusions be supported by evidence of the parent's fitness to care for the child at the time of the hearing. *See In re Z.G.J.*, 378 N.C. at 510. That requirement is met here. Accordingly, the trial court did not err in concluding that there were

grounds to terminate parental rights based on neglect. Since only one ground is needed in order to terminate parental rights, we do not consider whether the trial court erred in concluding that there were also grounds based on willfully leaving the children in foster care and abandoning the children.

## III.    Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights.

AFFIRMED.

Judges HAMPSON and FLOOD concur.

Report per Rule 30(e).